# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*People v. Brown*, 2013 IL App (1st) 091009

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY BROWN, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-09-1009 |
| Filed<br>Rehearing denied | April 16, 2013<br>May 16, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The dismissal of defendant's successive postconviction petition alleging his actual innocence based on new DNA evidence was affirmed, since an insufficient showing of actual innocence was made and postconviction counsel provided reasonable assistance. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 94-CR-4431 (01); the Hon. Vincent M. Gaughan, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal
Michael J. Pelletier, Alan D. Goldberg, and Sean Collins-Stapleton, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Amy Watroba, and Mary P. Needham, Assistant State's Attorneys, of counsel), for the People.

Panel
PRESIDING JUSTICE HARRIS delivered the judgment of the court, with opinion.

Justices Quinn and Simon concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant, Anthony Brown, appeals the dismissal of his successive petition for relief under the Post-Conviction Hearing Act (Act). 725 ILCS 5/122-1 *et seq.* (West 2010). In his petition, defendant made a freestanding claim of actual innocence based on new deoxyribonucleic acid (DNA) testing performed on several pieces of evidence in accordance with section 116-3 of the Code of Criminal Procedure of 1963 (Code). 725 ILCS 5/116-3 (West 2000)). After an evidentiary hearing, the circuit court found the new evidence was not of such a conclusive nature that it would have changed the result of defendant's trial or affected any jury's determination. In addition to challenging the circuit court's dismissal of his postconviction petition, defendant alternatively argues that his postconviction counsel was ineffective. At issue is whether the circuit court's decision is manifestly erroneous and whether postconviction counsel provided defendant with a reasonable level of assistance. We hold the circuit court's finding that defendant did not make a showing of actual innocence substantial enough to warrant a new trial is not manifestly erroneous. Additionally, we hold that defendant's postconviction counsel provided a reasonable level of assistance.

¶ 2                        JURISDICTION

¶ 3    On March 11, 2009, the circuit court denied defendant's successive postconviction petition after conducting an evidentiary hearing. On April 8, 2009, the circuit court denied defendant's motion to reconsider. On that same date, defendant timely filed his notice of appeal. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rule 651(a). Ill. S. Ct. R. 651(a) (eff. Feb. 6, 2013).

¶ 4                        BACKGROUND

¶ 5    Following a jury trial, defendant was convicted of two counts of first degree murder, one count of aggravated vehicular hijacking, one count of aggravated criminal sexual assault, and one count of armed robbery.

-2-

¶ 6                                     Defendant's Trial and Initial Appeal

¶ 7         A detailed account of defendant's trial and initial appeal is well stated in our supreme court's 1998 opinion. *People v. Brown*, 185 Ill. 2d 229 (1998). Below we will discuss those details from defendant's trial and initial appeal as they pertain to his successive postconviction petition.

¶ 8         On January 12, 1994, Reginald Wilson, Felicia Lewis, and Steven Fitch were in Wilson's Chevrolet Blazer automobile when they stopped at a gas station to allow Wilson and Fitch to use the restrooms. When Fitch returned to the car, he noticed someone outside the Blazer letting another person in on the passenger side. When he approached the Blazer, the person outside the car asked him what he was looking at. Another person, not Wilson, was in the driver's seat. The Blazer drove off and Fitch called the police.

¶ 9         Zarice Johnson, a codefendant and friend of defendant's, testified on behalf of the State at defendant's trial. Johnson testified that defendant picked him up from his apartment in the evening. Already inside defendant's car, a Chevrolet Caprice, were codefendants Scott Chambers, Stanley Hamelin, and Carl Williams. Hamelin suggested that they steal a car, a plan defendant agreed to. They then stopped at a gas station. As they were leaving, they saw a Chevrolet Blazer automobile. Hamelin, Chambers, and Williams got out and went back to the gas station. Johnson did not notice what Williams was doing, but he did see Chambers enter the Blazer while Hamelin stood by the passenger side. Johnson also saw a person approach the passenger side of the Blazer before quickly walking back to the gas station. After driving around the block in his Caprice, defendant returned to the gas station. Defendant, with Johnson in the backseat, drove away. The Blazer followed defendant's car. Eventually, both cars pulled to the side of the highway. Defendant left his car and went to talk to the people in the Blazer. Johnson stayed in defendant's car, but defendant informed him on his return that a pretty woman and a man were inside the Blazer. Both cars drove off.

¶ 10        Later, both cars pulled into a parking lot. Defendant got out of his Caprice and talked to Hamelin and Williams. Hamelin told defendant that a car alarm and stereo were in the Blazer while Williams told defendant there was a compact disc (CD) player. Defendant asked Hamelin and Williams if there was any money inside, to which neither Williams nor Hamelin immediately responded. Defendant then returned to his car. Hamelin then walked over and gave defendant a bundle of money, which defendant put in his pocket. Hamelin also showed defendant a ring he had taken.

¶ 11        Defendant, while laughing, told Johnson that he was going to make the woman perform oral sex on him. He then got the woman from the Blazer and brought her to his car. He made Johnson move to the front passenger seat while defendant forced the woman into the backseat of the Caprice. Hamelin handed Johnson a Kenwood stereo and a portable CD player stolen from the Blazer. After defendant forced the woman to perform oral sex on him, defendant told her to remove her pants. The woman was crying. Johnson told her to cooperate with defendant and to stop crying. The woman stated that she was menstruating and that she had given birth in November. When defendant told her that she was lying, she replied that she was wearing a sanitary pad. Defendant had the woman place her coat on the

car seat before having sexual intercourse with her. Defendant forced the woman to have intercourse and oral sex with him several more times. Defendant stated that he was going to drive around to find a spot to take Wilson and Lewis to kill them. Hamelin and Chambers later killed Lewis and Wilson. The five offenders each took part of the money recovered from the Blazer. After returning to the Blazer, 20 to 25 compact discs and cassette tapes were recovered, placed in a plastic bag, and given to defendant. Johnson and defendant were arrested together on January 13, 1994.

¶ 12 Johnson acknowledged that he was also charged with the crime, but that he entered into a plea agreement with the State. Johnson agreed he would plead guilty to one count each of first degree murder, armed robbery, vehicular hijacking, and criminal sexual assault. In exchange for his truthful testimony, the State agreed it would recommend a prison term of 35 years. According to Johnson, he would be eligible for release, if he received day-for-day good-time credit, in 17 1/2 years. For five months before testifying, Johnson lived in the county jail's witness protection program. He acknowledged that when the police first questioned him, he denied any involvement in the crime.

¶ 13 Other evidence presented at trial showed that at the time of his arrest, defendant possessed approximately $500 in cash on him. Compact discs, cassette tapes, a Kenwood stereo, a Panasonic CD player, an adapter, an earring stud, a cassette radio, and videotapes were recovered from defendant's Caprice. Found inside the Blazer was an earing, a plastic camera, a Panasonic CD player case, and an instruction manual and storage case for a Kenwood stereo.

¶ 14 Pamela Fish, from the Chicago police department crime laboratory, testified that swabs taken from Lewis were all negative for the presence of semen. Fish testified that this was not unusual because "of the three thousand or so criminal sexual assaults that are submitted into the laboratory per year, approximately half of them are negative for the presence of semen or spermatozoa." She determined Lewis to have blood type O. She found a small area that tested positive for human blood taken from the seat cushions of defendant's Caprice, but was not able to further test the blood due to its small size. She believed it to be a smear-type stain, possibly placed there by a hand. Inside the underwear defendant was wearing at the time of his arrest, Fish found a nickel-sized reddish-brown stain. She concluded this was a smear stain and was a mixture of seminal material and human blood. Fish determined defendant's blood type was type O. She attempted to test the underwear stain for genetic markings, but was unable to do so. She testified that the inability to obtain a result in the test is generally from one of two causes: either the DNA material has degraded or the sample is too small. She opined that it was "a human bloodstain that contains some seminal material." Half of the United State's population has type O blood. She could not determine when either the stain or the blood was placed in the car seat or defendant's underwear.

¶ 15 Dr. Barry Lifschultz, a staff pathologist with the Cook County medical examiner's office, testified regarding the autopsies he performed on the two victims. Swabs were taken of Lewis's oral, rectal, and vaginal cavities. A sanitary napkin was also recovered. He did not find any evidence of sexual trauma to Lewis's genital area.

¶ 16 Scott Rochowicz, a member of the microscopic trace evidence unit of the crime

laboratory of the Chicago police department, testified that hairs recovered from Lewis's clothing were similar to her own hairs. Hairs recovered from defendant's clothing were similar to his own hairs, including hairs found in his underwear.

¶ 17　　The jury found defendant guilty of the first degree murders of Wilson and Lewis; the armed robbery and aggravated vehicular hijacking of Wilson, and the aggravated criminal sexual assault of Lewis. The circuit court sentenced defendant to death for his first degree murder convictions, and concurrent 30-year prison terms for his aggravated vehicular hijacking and aggravated criminal assault convictions. The circuit court merged defendant's conviction for armed robbery with his vehicular hijacking conviction.

¶ 18　　On appeal, defendant alleged the State failed to prove him guilty beyond a reasonable doubt. In particular, he alleged that Johnson's testimony was insufficient to support the jury's verdict. Defendant additionally argued that the State made improper comments during both opening and closing argument, that several errors occurred at his sentencing hearing, and that the Illinois death penalty statute (720 ILCS 5/9-1 (West 1994)) was unconstitutional. Our supreme court affirmed defendant's convictions and sentence. On June 24, 1999, defendant's petition for writ of *certiorari* was denied. *Brown v. Illinois*, 527 U.S. 1041 (1999) (table).

¶ 19　　　　　　　　　　　　First Postconviction Petition

¶ 20　　On January 15, 1998, defendant filed his first postconviction petition challenging his sentence. The circuit court dismissed the petition, and defendant appealed. On January 10, 2003, defendant's sentence was commuted to natural life in prison. Defendant's appeal was dismissed as moot.

¶ 21　　　　　　　　　　　　Motion for Forensic Testing

¶ 22　　On August 1, 2001, defendant filed a motion for forensic DNA testing of his boxer shorts pursuant to section 116-3 of the Code. 725 ILCS 5/116-3 (West 2000). The circuit court granted defendant's motion. On June 18, 2002, defendant filed a motion seeking additional DNA testing on the vaginal, oral and rectal swabs taken from Lewis, and the sanitary pad taken from her clothing. The circuit court granted defendant's motion. On June 27, 2002, defendant requested additional DNA testing be done on the car seat of the Caprice, which the circuit court granted.

¶ 23　　　　　　　　　　　　Defendant's Successive Petition

¶ 24　　On June 4, 2001, defendant filed a successive postconviction petition, in which he alleged actual innocence based on the new DNA testing. He amended his successive petition on March 21, 2003. In his successive petition, defendant outlined the new DNA evidence that he alleged supported his position. First, DNA testing was performed on defendant's blue and white boxer shorts and a material cutting from those boxer shorts. Regarding the non-sperm fraction of the blue and white boxer shorts, the data indicated the following:

"that DNA from more than one individual was obtained from the non-sperm fraction of the blue and white boxer shorts. The DNA obtained from this sample contains DNA from

-5-

a male. The primary DNA profile obtained from this sample matches the DNA profile obtained from the swab labeled [defendant]. Felicia Lewis is excluded as the primary source of the DNA obtained from this sample. Using nine of thirteen loci, Felicia Lewis cannot be excluded as a secondary source of the DNA obtained from this sample. No conclusion can be made regarding Felicia Lewis and this sample at the remaining loci."

The approximate frequencies in the Caucasian, African American, and Hispanic populations of the combination of all possible types of the nine loci included in the DNA types reported, making no assumptions regarding the number of DNA sources, were 1 in 330,000 unrelated Caucasian individuals; 1 in 510,000 unrelated African American individuals; and 1 in 330,000 unrelated Hispanic individuals.

¶ 25 The DNA obtained from the sperm fraction of the blue and white boxer shorts was from a male. The DNA profile of this sample matched defendant's DNA profile. Lewis was excluded as the source of the DNA from the sperm fraction of the blue and white boxer shorts.

¶ 26 The DNA from the non-sperm fraction of the material cutting showed the following:

"That DNA from more than two individuals was obtained from the non-sperm fraction of the material cutting labeled ext. boxer shorts. The DNA obtained from this sample contains DNA from a male and DNA from a female. Felicia Lewis cannot be excluded as a source of the DNA obtained from this sample. Using ten of thirteen loci, [defendant] cannot be excluded as a source of DNA obtained from this sample. No conclusion can be made regarding [defendant] and this sample at the remaining loci."

The approximate frequencies in the Caucasian, African American, and Hispanic populations for this sample, making no assumptions regarding the number of DNA sources, were 1 in 71,000 unrelated Caucasian individuals; 1 in 18,000 unrelated African American individuals; and 1 in 88,000 unrelated Hispanic individuals.

¶ 27 The DNA obtained from the sperm fraction of the material cutting showed it was from a male. The report stated:

"Data were obtained from this sample at four of nine loci. Using three of these four loci, [defendant] cannot be excluded as the source of the DNA obtained from this sample. No conclusion can be made regarding [defendant] and this sample at the remaining loci. Felicia Lewis is excluded as a source of the DNA obtained from this sample."

¶ 28 Forensic DNA testing was also done on the car seat from defendant's Caprice; the oral, vaginal, and rectal swabs taken from Lewis; and the sanitary napkin recovered from the autopsy. The report contained no conclusions regarding the car seat, "due to insufficient amount of amplified product." The non-sperm fractions of the oral swab, vaginal swab, rectal swab, and sanitary napkin matched Lewis. The DNA obtained from the sperm fraction of the oral swab matched Lewis. "No DNA profile determined to be foreign to Felicia Lewis was detected" from the sperm fraction of the oral swab. The DNA from the sperm fraction of the vaginal swabs indicated "DNA from more than one individual," a male and a female. The primary DNA profile matched Lewis, while defendant was "excluded as a source of the DNA obtained" from the sperm fraction of the vaginal swabs. The DNA testing of the sperm fraction of the rectal swab was from a female, but no further conclusions were made "due to

an insufficient amount of amplified product." The DNA testing of the sperm fraction of the sanitary napkin showed the following:

"DNA from more than one individual was obtained from the sperm fraction of the sanitary napkin. The DNA obtained from this sample contains DNA from a male and DNA from a female. The primary DNA profile obtained from this sample matches the DNA profile obtained from the blood swatch labeled Felicia Lewis. [Defendant] is excluded as the source of the DNA obtained from this sample."

¶ 29    Defendant alleged that the DNA evidence was new, it having been discovered in 2002 and 2003. He asserted it was noncumulative and that the DNA technology used in the new tests was not available at his trial. Defendant also argued that he used reasonable diligence in obtaining the new evidence. He argued that it would probably change the result of his trial upon retrial because it "is not merely impeaching Zarice Johnson's credibility, but is also probative of a factual situation different from the one presented in Zarice Johnson's testimony; whereas Zarice Johnson testified [defendant] raped Felicia Lewis, the DNA evidence is probative of a factual situation where someone other than [defendant] raped Ms. Lewis." Defendant asserted this evidence went to the ultimate issue of whether he was present and involved in the crimes charged. He characterized Johnson's testimony as "the cornerstone of the State's case against" him. He pointed to statements made by the prosecution in opening and closing arguments regarding Johnson's testimony. Defendant pointed out that at trial, Fish testified that she did not find any sperm on the vaginal swab taken from Lewis. However, the new DNA evidence showed sperm, from a man, but not defendant, on the vaginal swab. Defendant argued that the sperm found on the sanitary napkin during the new DNA tests that did not match his DNA showed that he was not present during the commission of the crime. Regarding the stain on defendant's boxer shorts, defendant argued that "[w]hile the DNA evidence cannot exclude Felicia Lewis as a contributor to the DNA found in the stain on the boxers, she cannot be included either." Based on this evidence, defendant requested an evidentiary hearing, that his conviction be vacated, and that a new trial be ordered.

¶ 30    On April 21, 2003, the State moved to dismiss defendant's second petition arguing that the new DNA testing presented an even stronger case of defendant's guilt in the crimes for which he was convicted. The State attached to its motion a statement from Chambers that he made to the police on January 14, 1994. In the statement, Chambers states both defendant and Williams sexually assaulted Lewis on the date of the crime. The State argued that the fact that defendant's DNA was excluded from the sanitary napkin, and the vaginal, oral, and rectal swabs was inconclusive and did not show that he did not sexually assault Lewis. The State pointed out that defendant may have worn a condom or not ejaculated and argued that the emission of semen is not necessary to prove sexual penetration.

¶ 31    On June 5, 2003, the circuit court dismissed defendant's second petition. The court found that the new evidence would not have had a meaningful effect on the trial. The court made the following finding "[l]ooking at the totality of the facts that were presented, the corroboration of Mr. Johnson's testimony, and again, the evidence that was in this case, I find there is not a substantial showing of a violation of [defendant's] constitutional rights to merit relief." Defendant timely appealed.

¶ 32                          Appeal of Defendant's Successive Petition

¶ 33        On December 2, 2005, this court reversed the order of the circuit court dismissing defendant's successive postconviction petition and remanded the matter for an evidentiary hearing. *People v. Brown*, No. 1-03-1895 (2005) (unpublished order under Supreme Court Rule 23). Defendant argued that he had made a substantial showing of a violation of his constitutional rights which established his actual innocence based on the new DNA results. This court noted that the DNA testing showing negative or nonmatch results excluding the victim as the source of the DNA from the sperm fraction of the material cutting and boxer shorts, in addition to the DNA results excluding defendant as the source of the DNA found in the vaginal swabs and sanitary napkin, were favorable to defendant and warranted an evidentiary hearing. This court agreed with the State that the results were "not clearly exculpatory." This court, however, characterized the evidence "as being 'somewhere in-between' clearly exculpatory and clearly inculpatory." *Id.* (quoting *People v. Dodds*, 344 Ill. App. 3d 513, 519 (2003). In conclusion, this court directed the circuit court to conduct an evidentiary hearing to "consider the trial evidence in light of the new DNA results to determine whether they are so conclusive to warrant a new trial" and to "decide whether the DNA evidence was a significant factor at trial and whether it was more likely than not to have affected the jury's determination."


¶ 34                                  Remand Proceedings

¶ 35        On remand, at the evidentiary hearing, defendant presented six stipulations that he entered into with the State before resting. We will discuss each stipulation in turn, below. Megan Neff, a DNA analyst at "the ISP Forensic Services Center" and an expert in forensic DNA analysis, would have testified that it was her opinion, within a reasonable degree of scientific certainty, that defendant's codefendants Hamelin, Chambers, Johnson, and Williams can all be excluded as the source of the male DNA found on the vaginal swabs and the sanitary napkin.

¶ 36        Tom Fedor, a forensic serologist at the serological research institute in Richmond, California, an expert in the field of forensic DNA analysis, would have testified that he conducted statistical calculations in this case. He received DNA data from the vaginal swabs, sanitary napkin, and blood standard from Lewis and DNA data from a buccal swab standard collected from Hudson. Fedor would have opined, with a reasonable degree of scientific certainty, "that a minor male DNA profile can be deduced from the mixture of DNA profiles identified in the vaginal swabs" and that "Hudson is not excluded as the sole source of the minor profile from the vaginal swabs." Further, "[a]pproximately 1 in 117,000 unrelated individuals is not excluded as the sole minor contributor in the vaginal swabs." He would have further opined "that a minor male DNA profile can be deduced from the mixture of DNA profiles identified in the sanitary napkin" and that "Hudson is not excluded as the sole source of the minor profile from the sanitary napkin." He would have further testified that "[a]pproximately 1 in 400,000 unrelated individuals is not excluded as the sole minor contributor in the sanitary napkin."

¶ 37     Kathy Kozak, a forensic scientist in the forensic biology and DNA section of the forensic science center of the Illinois State Police forensic sciences command, an expert in forensic DNA analysis, would have testified that she received the DNA data for the vaginal swabs and sanitary napkin. She would have testified that "[a] search of the DNA types attributed to the minor male DNA donor in these samples indicated that an individual by the name of Antoine Hudson may be a possible donor of the minor male DNA profile identified" in the vaginal swabs and sanitary napkin. Further, "[t]he minor male DNA profile searched from this case was not linked to any other convicted offenders or case samples stored in the DNA databases searched."

¶ 38     Amber Moss, a DNA analyst from Orchid Cellmark, an expert in forensic DNA analysis, would have testified that in 2007 she received the buccal swab standard from Hudson. Cellmark personnel generated a DNA profile from the swab suitable for comparison purposes. She also obtained the vaginal swabs, sanitary napkin, and blood standard from Lewis. Moss would have opined, with a reasonable degree of scientific certainty, that "Hudson cannot be excluded as a possible donor to the mixture of DNA profiles identified in the vaginal swabs." She would have further stated that "[u]sing all possible combinations of all possible types in the mixture *** approximately 1 in 515 Black, 1 in 2,703 Caucasian, 1 in 2,300 Southwest Hispanic, 1 in 2,159 Southeast Hispanic, or 1 in 8,741 General Asian unrelated individuals cannot be excluded from having contributed to the mixture of DNA profiles identified on the vaginal swabs." Moss would also opine that Hudson could not "be excluded as a possible donor to the mixture of DNA profiles identified in the sanitary napkin." Moss would have stated "that approximately 1 in 360 Black, 1 in 493 Caucasian, 1 in 676 Southwest Hispanic, 1 in 466 Southeast Hispanic, or 1 in 2,535 General Asian unrelated individuals cannot be excluded from having contributed to the mixture of DNA profiles identified in the sanitary napkin."

¶ 39     Bradford Lee, an investigator employed by the Cook County State's Attorney's office, would have testified that he collected the buccal swab standard taken from Hudson's mouth, and inventoried it in the proper vault, before sending it to Orchid Cellmark.

¶ 40     Wendy Magee, a DNA analyst at Cellmark Diagnostics, an expert in forensic DNA analysis, would have testified that she received, among other items, the vaginal swabs and the sanitary napkin. Cellmark personnel conducted DNA analysis on these items. Magee would have testified that "[a]n extraction technique was used in an attempt to separate the sperm cells contained in these items from the other types of cells in each sample. This technique results in a 'non-sperm' sample tube and a 'sperm' sample tube which are profiled separately." For comparison purposes, she obtained Lewis' blood standard and defendant's buccal swab. Magee would have made, within a reasonable degree of scientific certainty, the following opinions: "that a female DNA profile was identified in the non-sperm fractions of the vaginal swabs and sanitary napkin which matches the DNA profile from Felicia Lewis"; "that a mixture of DNA profiles was identified from the sperm fraction of the vaginal swabs which contains DNA from a male and a female"; "that the primary profile from the sperm fraction of the vaginal swabs matches the DNA profile of Felicia Lewis"; "that [defendant] can be excluded as the source of the male DNA obtained from the vaginal swabs"; "that a mixture of DNA profiles was identified in the sperm fraction of the sanitary napkin which

contains DNA from a male and a female"; "that the primary profile from the sperm fraction of the sanitary napkin matches the DNA profile of Felicia Lewis"; and "that [defendant] can be excluded as the source of the male DNA obtained from the sanitary napkin."

¶ 41    The State provided an affidavit from Antoine Hudson, Lewis's husband. Hudson attested that he married Lewis in September of 1992 and that Lewis was in the Army during their marriage and stationed outside of Illinois. He stated that "[a]lthough we remained legally married, we went through periods of time where we did not see one another." They did, however, see each other when Lewis was in the Chicago area. Hudson attested that "Lewis and I maintained a sexual relationship in spite of the times we lived apart." He made the following statement: "I recall Felicia Lewis returning to the Chicago area from military service in late 1993. I did see Felicia Lewis after her return home. We engaged in sexual intercourse periodically from the time she returned until she was murdered in January 1994." The State argued that Hudson's affidavit reasonably explained the presence of Hudson's DNA on the vaginal swab and sanitary napkin.

¶ 42    After the evidentiary hearing, the circuit court denied defendant's petition. The court noted "[t]here is nothing linking Mr. Hudson with any of the events on the day of the tragedy or the following early mornings" before finding that the new evidence does not impeach Johnson's trial testimony. In conclusion, the circuit court judge stated: "Weighing all the evidence and in light of the DNA results, I do not find that the evidence [is] so conclusive *** to warrant a new trial. I also find that it's not likely that this would affect any jury's determination."

¶ 43    On April 9, 2009, defendant filed a motion to reconsider, which the circuit court denied on April 8, 2009. Defendant timely appealed.


¶ 44                                    ANALYSIS

¶ 45    Before this court, defendant argues that he should be given a new trial because postconviction DNA testing produced evidence that would have undermined the testimony of the State's key witnesses, Pamela Fish and Zarice Johnson, thus altering the outcome of his trial. Specifically, defendant claims that the postconviction DNA testing contradicted Fish's testimony that no seminal material was present on Felicia Lewis's vaginal swab and Johnson's testimony that defendant repeatedly sexually assaulted Lewis. According to defendant, Fish's testimony would be undermined due to the new DNA evidence showing that Antoine Hudson, Lewis's husband, was the source of the DNA on the vaginal swab and sanitary pad. Regarding Johnson's testimony, defendant asserts that at a new trial, jurors would learn that although the new DNA evidence could not exclude Lewis as the source of the DNA found on Brown's underwear, the DNA could have been from a woman of Caucasian, African American, or Hispanic origin. Defendant asserts that our review should be *de novo* because no live witness testimony was presented at his evidentiary hearing. According to defendant, the circuit court was not required to make any credibility determinations because the evidence presented came in the form of stipulations.

¶ 46    In the alternative, defendant argues that we should remand the matter for a new evidentiary hearing due to his postconviction counsel's "unreasonable presentation of critical

-10-

DNA evidence." Specifically, defendant argues that "[t]o the extent post-conviction counsel failed to contrast the critical probative difference between a nine-loci match and a thirteen-loci match, counsel rendered unreasonable assistance at the evidentiary hearing."

¶ 47     In response, the State argues that the circuit court properly denied defendant's successive postconviction petition because defendant failed to make a substantial showing of actual innocence. Specifically, the State argues that the new DNA evidence does not substantially show that defendant did not commit the sexual assaults or the other offenses for which he was convicted. The State stresses that there is no requirement that defendant's DNA has to be among the evidence of the crimes to establish his guilt. Furthermore, there is no conflict in the results of the new DNA testing that would lead to a different outcome at trial. The State disputes defendant's contention that our review should be *de novo*. The State asserts that the manifest error standard of review is proper where this court reviews the circuit court's postconviction findings after an evidentiary hearing. The State also maintains that defendant's postconviction counsel rendered defendant reasonable assistance.

¶ 48                                    Actual Innocence

¶ 49     The Act allows criminal defendants to challenge their conviction or sentence based on substantial deprivations of their constitutional rights. *People v. Peeples*, 205 Ill. 2d 480, 509. (2002). Petitions under the Act are considered a collateral attack on a final judgment as opposed to a substitute for an appeal. *People v. Edwards*, 2012 IL 111711, ¶ 21. Therefore, *res judicata* bars issues previously decided on appeal. *People v. Williams*, 209 Ill. 2d 227, 232 (2004). Similarly, issues not raised, even though they could have been raised on appeal, are waived. *Id.* The Act contemplates the filing of only one postconviction proceeding, and Illinois courts disfavor successive postconviction actions. *Edwards*, 2012 IL 111711, ¶¶ 22, 29. The relaxation of the prohibition of successive postconviction proceedings, however, is proper in two instances. *Id.* ¶ 22. Under the cause-and-prejudice test, as codified by section 122-1(f) of the Act, a petitioner must establish cause-and-prejudice for not raising the claim earlier. *Id.*; 725 ILCS 5/122-1(f) (West 2010). In the second instance, under the " 'fundamental miscarriage of justice' exception," a petitioner has to show actual innocence. *Edwards*, 2012 IL 111711, ¶ 23 (quoting *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002)); see also *People v. Ortiz*, 235 Ill. 2d 319, 330 (2009) ("where a defendant sets forth a claim of actual innocence in a successive petition, the defendant is excused from showing cause and prejudice"). In this case, defendant makes an actual innocence claim.

¶ 50     The due process clause of the Illinois Constitution allows postconviction petitioners to make freestanding claims of actual innocence based on newly discovered evidence. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). "For new evidence to warrant a new trial, the evidence (1) must be of such conclusive character that it will probably change the result on retrial; (2) must be material to the issue, not merely cumulative; and (3) must have been discovered since trial and be of such character that the defendant in the exercise of due diligence could not have discovered it earlier." *People v. Orange*, 195 Ill. 2d 437, 450-51 (2001). "Evidence is considered cumulative when it adds nothing to what was already before the jury." *Ortiz*, 235 Ill. 2d at 335. Defendant bears the burden of making a substantial

showing of a deprivation of constitutional rights at an evidentiary hearing. *People v. Coleman*, 206 Ill. 2d 261, 277 (2002).

¶ 51                                    Standard of Review

¶ 52     Typically, the standard of review for the dismissal of a postconviction petition without an evidentiary hearing is *de novo*, whereas the dismissal of a postconviction petition after an evidentiary hearing is reviewed for manifest error. *People v. Johnson*, 206 Ill. 2d 348, 357 (2002). Recently, our supreme court held in *People v. English* that *de novo* review may be appropriate in some circumstances. *People v. English*, 2013 IL 112890, ¶¶ 23-24. Our supreme court explained:

"The Act provides a three-stage process for adjudicating postconviction petitions. [Citation.] *** After an evidentiary hearing where fact-finding and credibility determinations are involved, the circuit court's decision will not be reversed unless it is manifestly erroneous. [Citation]. However, if no such determinations are necessary at the third stage, *i.e.*, no new evidence is presented and the issues presented are pure questions of law, we will apply a *de novo* standard of review, unless the judge presiding over postconviction proceedings has some special expertise or familiarity with defendant's trial or sentencing and that familiarity has some bearing upon disposition of the postconviction petition. [Citation.]

At the third-stage hearing in this case, the circuit court heard no new evidence; instead, the court reviewed the trial transcripts and heard arguments of counsel. In addition, the judge presiding over the hearing did not preside over defendant's trial and, thus, had no special expertise or familiarity with defendant's trial. Under these circumstances, the standard of review is *de novo*. [Citations.]" *Id.* ¶¶ 23-24.[1]

¶ 53     In this case, the parties do not dispute that an evidentiary hearing was held. Unlike in *English*, the circuit court in this case did review new evidence, *i.e.*, the new DNA evidence presented by defendant. Additionally, the circuit judge presiding over defendant's postconviction proceedings was the same circuit judge who presided over defendant's original trial. Accordingly, we hold that for this case, the appropriate standard of review is the manifestly erroneous standard of review. "Manifest error is that which is 'clearly evident, plain, and indisputable.' " *People v. Johnson*, 206 Ill. 2d 348, 360 (2002) (quoting *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997)).

¶ 54     We hold the circuit court's finding that defendant did not make a showing of actual innocence substantial enough to warrant a new trial is not manifestly erroneous. The new

---

[1]Justice Freeman, in his concurring opinion in *English*, disputed that the proceedings had even reached the evidentiary hearing stage under the Act. *People v. English*, 2013 IL 112890, ¶ 60 (Freeman, J., specially concurring, joined by Burke, J.). Justice Freeman characterized the proceedings as second-stage proceedings, which apply *de novo* review to the circuit court's legal determination made on the pleadings. *Id*. Justice Freeman additionally stated that "the fact that the judge did not preside over the original trial has no relevance to the standard of review employed." *Id.*

DNA evidence does not exonerate defendant because it does not show that he did not commit the crimes he was charged with. We note that "DNA, in and of itself, does not confirm the commission of a crime; rather, it confirms an individual's identity." *People v. Rivera*, 2011 IL App (2d) 091060, ¶ 31; see also *People v. Hunter*, 358 Ill. App. 3d 1085, 1093 (2005) (quoting *People v. Hall*, 352 Ill. App. 3d 537, 549 (2004)). Furthermore, DNA evidence that does not match a defendant's DNA does not exonerate the defendant. *Rivera*, 2011 IL App (2d) 091060, ¶ 31; see also *People v. Allen*, 377 Ill. App. 3d 938, 944 (2007) (stating that "[t]he absence of defendant's DNA on the gun would not conclusively establish that he did not handle the gun or that he did not commit the *** robbery"). In this case, the new DNA evidence, at best, only establishes that the DNA of Hudson, Lewis's husband, was found on the vaginal swab and the sanitary napkin and that defendant can be excluded as a possible contributor of DNA on the vaginal swab and sanitary napkin. Defendant presented no other evidence that Hudson had any involvement at all in the crimes. The State, however, presented Hudson's affidavit in which he attested that, upon Lewis's return to the Chicago area in late 1993, Hudson and Lewis "engaged in sexual intercourse periodically from the time she returned until she was murdered in January of 1994." The State presented a plausible explanation for the presence of Hudson's DNA on the swab and the sanitary napkin that defendant did not refute. We reiterate that defendant has the burden of making a substantial showing of a deprivation of constitutional rights at an evidentiary hearing. *Coleman*, 206 Ill. 2d at 277. Defendant failed to meet that burden here.

¶ 55    Additionally, we hold that the new DNA evidence did not undermine either Johnson's or Fish's testimony from the trial. Fish testified that she was unable to find seminal material. The discovery of Hudson's DNA does not undermine Fish's testimony because it does not help or harm defendant. All it shows is that DNA from an admitted sexual partner of Lewis's was found. Furthermore, Fish testified that it was not unusual to not find the presence of semen because "of the three thousand or so criminal sexual assaults that are submitted ***, approximately half of them are negative for the presence of semen or spermatozoa." Defendant in no way refutes this proposition. He does not show that the absence of his DNA exonerates him.

¶ 56    We also fail to see how the new DNA evidence undermines Johnson's testimony. We note that defendant already challenged Johnson's testimony on direct appeal. *Brown*, 185 Ill. 2d at 247-51. Our supreme court held that Johnson's testimony was sufficiently corroborated to provide a sufficient basis for the jury's verdicts. *Id.* at 249. Nonetheless, defendant argues that the new DNA evidence impeaches Johnson's testimony that defendant repeatedly sexually assaulted Lewis. However, like defendant's argument regarding Fish's testimony, defendant has not presented any evidence that repeated sexual assaults increase the likelihood that defendant's DNA would be found. Rather, defendant's argument is purely speculative which does not establish that the outcome of his trial would have been different. *People v. Pecoraro*, 175 Ill. 2d 294, 315 (1997) (holding that a claim based on speculation "is insufficient to establish a reasonable probability that the outcome of defendant's trial would have been different"). We hold that the new DNA evidence does not undermine either Fish's or Johnson's trial testimony.

¶ 57    Defendant has failed to produce evidence of such a conclusive character that it would

change the outcome of his trial upon retrial. We cannot say that the circuit court's decision to deny defendant postconviction relief "is 'clearly evident, plain, and indisputable.' " *Johnson*, 206 Ill. 2d at 360 (quoting *Ruiz*, 177 Ill. 2d at 384-85). Accordingly, we hold the circuit court's decision is not manifestly erroneous and, therefore, must be upheld.

¶ 58                                  Ineffective Assistance of Counsel

¶ 59     A postconviction petitioner does not have a constitutional right to the assistance of counsel; rather, a petitioner only has the right to counsel as provided by statute. *People v. Suarez*, 224 Ill. 2d 37, 42 (2007). "Because the source of the right to counsel in a post-conviction matter is statutory rather then constitutional, the degree of skill and care that a lawyer must exercise in representing a post-conviction petitioner is not controlled by the sixth amendment standard announced by the Supreme Court in *Strickland v. Washington*." *People v. McNeal*, 194 Ill. 2d 135, 142 (2000) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). Under the Act, petitioners are only entitled to "a reasonable level of assistance." *Suarez*, 224 Ill. 2d at 42. Illinois Supreme Court Rule 651(c) addresses the duties imposed on postconviction counsel. *Id.* Rule 651(c) provides, in relevant part:

> "(c) *** [I]f the trial court determines that the petitioner is indigent, it shall order that a transcript of the record of the post-conviction proceedings, including a transcript of the evidence, if any, be prepared and filed with the clerk of the court to which the appeal is taken and shall appoint counsel on appeal ***. The record filed in that court shall contain a showing, which may be made by the certificate of petitioner's attorney, that the attorney has consulted with petitioner by phone, mail, electronic means or in person to ascertain his or her contentions of deprivation of constitutional rights, has examined the record of proceedings at the trial, and has made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions." Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013).

Our supreme court "has consistently held that remand is required where postconviction counsel failed to fulfill the duties of consultation, examining the record, and amendment of the *pro se* petition, regardless of whether the claims raised in the petition had merit." *Suarez*, 224 Ill. 2d at 47.

¶ 60     In this case, we cannot say that defendant's postconviction counsel failed to provide him a reasonable level of assistance. Defendant focuses on his counsel's failure "to contrast the critical probative difference between a nine-loci match and a thirteen-loci match" of the DNA results. As stated above, the new DNA evidence presented by defendant does not show that he did not commit the crimes of which he was convicted. He neither refutes nor undermines Johnson's testimony at trial linking him to the crime. Although differences in DNA analysis testing results may be critical in many instances, this is not one of them because the new DNA evidence defendant presented does not show defendant's actual innocence in this case. Furthermore, defendant has made no argument before this court that his postconviction counsel failed in the duties imposed upon him by Illinois Supreme Court Rule 651(c). Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013). Defendant only has the right to counsel as provided by statute. *Suarez*, 224 Ill. 2d at 42. Defendant has not shown in this case that

his counsel acted unreasonably or that his counsel failed to fulfill his duties according to Illinois Supreme Court Rule 651(c). Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013). Accordingly, we hold that defendant's postconviction counsel provided a reasonable level of assistance.

¶ 61                                    CONCLUSION
¶ 62        The judgment of the circuit court is affirmed.

¶ 63        Affirmed.