No. 2-22-0112
Opinion filed June 9, 2023

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 07-CF-1753 |
| MICHAEL A. LUCIANO, | ) ) | Honorable Donald Tegeler Jr., |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices Hutchinson and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1    On Halloween 1990, Albert Gonzalez, leader of the Insane Deuces street gang in Aurora, was murdered by members of the Latin Kings street gang in Aurora. Police quickly developed information pointing to defendant, Michael A. Luciano, and other members of the Latin Kings. The State was presented with a choice: develop further information and charge defendant with murder or charge defendant as quickly as possible with what it could from the evidence on hand. The State chose the latter course and charged defendant in two cases: in 1990, in case No. 90-CF-1887, defendant was charged with six counts of unlawful possession of weapons by a felon (Ill. Rev. Stat. 1991 ch. 38, ¶ 24-1.1(a) (now 720 ILCS 5/24-1.1(a) (West 2020))), and in 1991, in case No. 91-CF-787, defendant was charged with four counts of unlawful possession of weapons by a

felon and one count of solicitation to commit aggravated discharge of a firearm (Ill. Rev. Stat. 1991, ch. 38, ¶ 8-1(a) (now 720 ILCS 5/8-1(a) (West 2020))).)

¶ 2    In this case, the third appeal before this court,[1] the State's choice to prosecute defendant as quickly as possible is at issue. The State appeals the order of the circuit court of Kane County granting relief to defendant following a third-stage postconviction hearing. We affirm as modified the trial court's judgment, and we reverse and vacate defendant's conviction.

¶ 3                           I. BACKGROUND

¶ 4    We summarize the facts necessary for an understanding of the issues raised in this appeal.

¶ 5                  A. Investigation of the Offense in 1990 and 1991

¶ 6    On October 31, 1990, Michael Langston, a detective with the Aurora Police Department, arrived at the Gonzalez residence, where Gonzalez was shot, about an hour after the shooting had occurred. He determined that the shots were fired from a grassy area about 60 yards from the residence. Langston's search of the area recovered six .22-caliber shell casings, one live .22-caliber round, two shotgun shell casings, one .30-caliber shell casing, and one .30-30-caliber shell casing. A further search of the area by an evidence technician recovered three .30-30 Winchester shell casings and parts of expended shotgun shells.

---

[1]The first case before us was defendant's direct appeal from his conviction of first degree murder (Ill. Rev. Stat. 1989, ch. 38, ¶ 9-1(a)). *People v. Luciano*, No. 2-09-0066 (Oct. 26, 2010) (unpublished order under Illinois Supreme Court Rule 23) (*Luciano I*). The second case involved defendant's appeal of the summary dismissal of his postconviction petition. *People v. Luciano*, 2013 IL App (2d) 110792 (*Luciano II*).

¶ 7 On November 4, 1990, the police executed a search warrant at a residence associated with defendant, located on East Galena Boulevard in Aurora. Police recovered firearms and ammunition, as well as documents and photographs related to the Latin Kings.

¶ 8 On November 7, 1990, a confidential source, later revealed as Hector Rodriguez, informed Robert Reichardt, an officer with the Aurora Police Department, about details of a Latin Kings meeting that occurred near Halloween 1990. Reichardt was told that defendant distributed firearms to Latin King members Robert "Droopy" Rangel, Jose "Bam Bam" or "Joe" Delatorre, and Jose "Speedy" Rivera. Rodriguez also informed Reichardt that, on November 3, 1990, after the Gonzalez murder, the weapons were returned to defendant and on November 4, 1990, the weapons were again moved. From Rodriguez's information, the State obtained search warrants and conducted searches of the residences that Rodriguez had linked to defendant and the Gonzalez murder.

¶ 9 On November 7, 1990, Reichardt executed a search warrant at an apartment associated with defendant on Best Place in Aurora (Best Place apartment), which was the residence of his father's girlfriend. Inside the bedroom, Reichardt found a Marlin .30-30 lever-action rifle, a Ted Williams 12-gauge shotgun with the barrel sawed off, a loaded Commando Mark .45-caliber assault rifle, a .30-caliber carbine, and another 12-gauge sawed-off shotgun. In addition to the firearms, police found 700 rounds of assorted ammunition of various calibers and gauges.

¶ 10 Juan Acevedo spoke with a police officer during that week. Acevedo revealed that, after the Gonzalez murder, Rangel, Michael "Loco" Rodriguez, and Delatorre drove to Acevedo's residence. The three used an outside water spigot to wash their faces and hands. At the time of this statement to police, Acevedo concealed the fact that the men also hid guns at his residence; it was not until the trial of defendant on the 2007 murder charges that Acevedo testified that the men hid firearms.

¶ 11    Testing on the weapons recovered from the Best Place apartment matched a spent .30-30 shell casing from the grassy area near the Gonzalez residence to the Marlin .30-30 rifle. Two of the spent shotgun shells recovered from the grassy area were matched to the Ted Williams 12-gauge shotgun. In addition, by April 1991, a fingerprint on the Commando Mark .45-caliber assault rifle was determined to belong to defendant.

¶ 12    In December 1990, Hector Rodriguez provided a recorded statement to the police. Rodriguez described a Latin Kings meeting that occurred before the Gonzalez murder. Rodriguez stated that, at that meeting, defendant instructed the members present to shoot opposing gang members, particularly members of the Insane Deuces, with whom the Latin Kings were at war, and defendant distributed firearms to the members to carry out the shootings. Defendant gave Rodriguez the .45-caliber assault rifle, gave Rangel the Ted Williams shotgun, and gave Delatorre the .30-30 Marlin rifle. Defendant also gave them instructions to shoot Gonzalez, the leader of the Insane Deuces. Rodriguez related that, on Halloween, he encountered defendant at a bar and defendant informed him that Gonzalez had already been shot. Rodriguez stated that, after Halloween, he observed Rangel and Delatorre return their weapons to defendant and, thereafter, he helped defendant move the firearms to another location to conceal them.

¶ 13    Late in 1990, the State began to prosecute cases arising from the Gonzalez murder. In December 1990, defendant was indicted in Kane County circuit court case No. 90-CF-1887 with six counts of unlawful possession of weapons by a felon (Ill. Rev. Stat. 1991, ch. 38, ¶ 24-1.1(a) (now 720 ILCS 5/24-1.1(a) (West 2020))).

¶ 14    In March 1991, the State presented Hector Rodriguez's account to the grand jury. The State also presented Acevedo's statement corroborating Rodriguez's claim that the Gonzalez shooting was ordered at a Latin Kings meeting. In addition, the State presented Acevedo's account of the immediate aftermath of the shooting, in which Rangel, Michael Rodriguez, and Delatorre came to

his house and used an outside spigot to wash their faces. The State presented information that, early in March 1991, Rangel bragged that he had shot Gonzalez. Rangel was eventually charged with the Gonzalez murder.

¶ 15    On May 28, 1991, defendant was indicted in Kane County circuit court case No. 91-CF-797. Defendant was charged with one count of solicitation to commit aggravated discharge of a firearm (Ill. Rev. Stat. 1991, ch. 38, ¶ 8-1(a) (now 720 ILCS 5/8-1(a) (West 2020))), by directing Hector Rodriguez to shoot at Gonzalez, and four counts of unlawful possession of weapons by a felon (specifically two shotguns, a Marlin .30-30-caliber rifle, and a Commando Mark .45-caliber rifle). We note that the count of solicitation to commit aggravated discharge of a firearm bears a handwritten modification of the date to October 28, 1990, with the original date being scratched out. There is no explanation or initials showing that the handwritten modification was properly agreed to and entered by the trial court.

¶ 16    In October 1991, Rangel was tried by a jury. He was acquitted after Acevedo offered perjured testimony establishing an alibi for Rangel.

¶ 17    In December 1991, defendant and the State entered into a plea agreement. Defendant pleaded guilty to the six counts of unlawful possession of weapons by a felon in case No. 90-CF-1887 and the four counts of unlawful possession of weapons by a felon in case No. 91-CF-797. In exchange for the guilty plea, the State agreed to nol-pros the solicitation count in case No. 91-CF-797. Defendant and the State did not reach any agreement regarding his sentence. At the sentencing hearing, the State presented Reichardt's testimony about defendant's role in the Gonzalez murder. Specifically, the State elicited that Reichardt had received information from Hector Rodriguez that defendant convened a meeting of the Latin Kings for the purpose of planning Gonzalez's shooting on Halloween, passed out weapons, and assigned shooting targets to the members present. In particular, Reichardt related that defendant gave Delatorre the Marlin .30-30 rifle and gave Rangel

the Ted Williams 12-gauge sawed-off shotgun and instructed them to shoot at the Gonzalez residence. Forensic evidence subsequently determined that those weapons, the Marlin .30-30 rifle and the Ted Williams shotgun, had been used in the Gonzalez murder. Reichardt also reviewed his investigation and the recovery of the weapons from the Best Place apartment. The State presented other witnesses who testified about defendant's involvement in the Latin Kings gang and its structure at that time.

¶ 18    The State argued that defendant should receive consecutive sentences because the offenses encompassed separate dates, they involved two sets of guns, and the guns were found in two distinct locations. The trial court rejected the State's position, stating, "What I have before me is possession of weapons by a felon, and I specifically find that that possession is not two separate acts, but an ongoing series of events and that consecutive sentencing is not available."[2] Defendant was sentenced to concurrent 5-year terms of imprisonment on each of the 10 counts to which he pleaded guilty.

---

[2]In *Luciano I*, we rejected defendant's challenge to the sufficiency of the evidence and affirmed his conviction following the trial on the 2007 murder charges (which we discuss below). We analyzed the evidence at trial and discussed how defendant's possession of the weapons and the physical evidence corroborated Hector Rodriguez's testimony specifically. We concluded that Rodriguez's testimony (the contours of which, we note, can be discerned in his statements to police made near in time to the shooting) gave "rise to the reasonable inference that defendant had oversight of gang weapons and, therefore, possessed the weapons before the shooting, as well as handed out the weapons" to the gang members to use in shooting Gonzalez. *Luciano I*, No. 2-09-0066, slip op. at 43.

¶ 19    We also note that, on February 4, 1992, the State filed its State's Attorney's statement, or pen letter. The State represented that, "upon search warrant, numerous weapons were found including murder weapon used in assassination of [Gonzalez]." The State further provided, as "factual information about defendant," that "defendant is a notorious leader of Latin King street gang in Aurora. His father, Angel Luciano, is reputed leader of Latin Kings. Defendant is dangerous and was previously charged with ordering [the] assasination [*sic*] of [a] gang member in Aurora. The case [(*i.e.*, the solicitation of aggravated discharge count)] was dismissed for lack of proof."

¶ 20                           B. 2007 Murder Charges and Trial

¶ 21    In 2007, defendant and his father, Angel Luciano, were charged with Gonzalez's murder. Both defendant and Angel Luciano were tried in a simultaneous bench trial. Defendant's trial counsel did not file a motion to dismiss the new charge pursuant to any theory that may have been available.

¶ 22    At the trial, Hector Rodriguez testified that defendant instructed him to shoot Gonzalez and gave him the Commando Mark .45-caliber assault rifle. A few days before October 31, 1990, Rodriguez went to a bar in downtown Aurora where defendant, Angel Luciano, and other Latin Kings members were present. Rodriguez testified that Angel Luciano instructed him to do a "drive-by" at Gonzalez's residence. Rodriguez testified that, on October 31, 1990, he attended a Latin Kings meeting with defendant, Rangel, and others. Defendant reiterated the instruction to Rodriguez to do a "drive-by" on Gonzalez. Rodriguez testified that, while armed with the Commando rifle, he drove to the Gonzalez house, where he observed police and emergency vehicles around the house. Rodriguez drove on, still with the rifle. Later, defendant told Rodriguez to "move" the rifle, so Rodriguez met defendant at a house and placed the rifle on a bed. Rodriguez observed other weapons that defendant had passed out at the earlier meeting and had collected

from the members. Rodriguez observed defendant wiping down the weapons and recognized the shotgun defendant had given to Rangel at the meeting.

¶ 23    At trial, Acevedo testified that, on October 31, 1990, he was at his residence in Aurora. Jose "Fang" Hernandez stopped by his residence and then left and did not return again that evening. Later in the evening, a car with four people, including Rangel, Delatorre, and Michael Rodriguez stopped at Acevedo's residence. The car's occupants washed their faces at an outside spigot, and the men, all of whom had guns, hid the guns in Acevedo's residence. Acevedo testified at trial that, in 1990, he lied to the police when he told the investigator that only three men had stopped by and that the men were not armed. Acevedo testified that, because he was on probation, he did not want the police to know that he had firearms in his residence. In the trial on the 2007 murder charges, Acevedo admitted that, during the 1991 Rangel trial, he lied when he testified that he had not seen Rangel on Halloween in 1990. Acevedo admitted that he had been convicted of perjury for his testimony in the Rangel trial and that he had served a five-year sentence for the offense.

¶ 24    Due to federal investigations, three witnesses came forward and testified at defendant's trial on the 2007 murder charges in exchange for significant sentencing considerations. Michael Rodriguez, Jose Oliva, and Hernandez each testified about their roles in the Gonzalez murder. Each testified he had attended a meeting around October 31, 1990, at which defendant distributed weapons and issued instructions to shoot Gonzalez and other members of the Insane Deuces. At that meeting, Angel Luciano stated that Halloween was a good opportunity to wear black (a gang color) and do shootings. They described that the weapons were spread across a table and defendant handed weapons to the members: Rangel received a shotgun, Delatorre received the Marlin .30-30 rifle, and Hector Rodriguez received the Commando .45-caliber rifle. Michael Rodriguez testified that defendant told him, Rangel, and Delatorre that they were to hit Gonzalez and that defendant had also instructed Hector Rodriguez to shoot Gonzalez. Michael Rodriguez further

testified that defendant explained that he was concerned that Hector Rodriguez would not follow through with the shooting.

¶ 25    Michael Rodriguez, Rangel, and Delatorre went to a park near the Gonzalez residence and fired their weapons at the house. Michael Rodriguez used a .22-caliber rifle he had been given at the Latin Kings meeting. He dropped the rifle on the grass as he, Rangel, and Delatorre ran back to Delatorre's car after they shot at Gonzalez's house. They went to Acevedo's house, dropped off the weapons, and washed their hands. Hernandez also testified that the shooters included Rangel and Delatorre and they arrived with their weapons at Acevedo's house.

¶ 26    In its closing argument, the State remarked that, "we also know [defendant pleaded] guilty to possessing those exact weapons [(the Marlin .30-30 rifle, the Ted Williams shotgun, and the Commando .45-caliber rifle)]." The State believed that defendant's 1991 guilty plea to possession of the weapons showed

> "his control over those weapons, whether it be constructive possession or actually in his hands, like he left those fingerprints on [the Commando .45-caliber rifle]. He had control over those weapons on November 4th, just like he had control over those weapons on Halloween evening when he passed them out to various members of the Latin Kings to go out and do this mission."

¶ 27    In its rebuttal closing argument, the State continued its theme: "what this case is really about is control of the weapons, control of the people, and control over the [Latin] Kings." The State argued, "What we have then is we have [defendant] involved in the distribution of those weapons, and that is the key element of his participation in [Gonzalez's murder]." The State concluded that defendant "aided," "abetted," and "solicited" the principals in Gonzalez's murder.

¶ 28    From the foregoing argument, the State's theory was clearly that defendant's possession of the weapons began no later than the meeting at which he passed out the weapons to the members

and continued through the Gonzalez shooting and until, on November 4, 1990, the weapons were finally seized. This possession was key to defendant's participation, and his actions indicated that he "solicited" the principals to perform the Gonzalez murder.

¶ 29    The trial court found defendant guilty of each count charged. The court also found that the State had not proved Angel Luciano guilty beyond a reasonable doubt. The court determined that, under accountability principles, defendant was culpable upon the State showing his "involvement, in some fashion, in sharing the criminal purpose underlying the offense." The court specifically noted that defendant's guilty plea to possessing the Marlin .30-30-caliber rifle and the Ted Williams 12-gauge sawed-off shotgun corroborated trial testimony that defendant controlled the weapons and distributed them at the meeting in which Gonzalez's murder was planned.

¶ 30    Before Gonzalez's murder and before the trial on the 2007 murder charges occurred, defendant had been convicted of a June 1989 murder. Thus, under the applicable law and despite defendant's age of 17 years at the time of the Gonzalez murder, the trial court imposed a sentence of natural life.

¶ 31                    C. Appeals and Postconviction Proceedings

¶ 32    In his direct appeal in *Luciano I*, defendant challenged only the sufficiency of the evidence. Defendant questioned how, when the trial court heard exactly the same evidence during the simultaneous bench trials of his father and himself, that evidence was somehow insufficient to prove his father guilty beyond a reasonable doubt yet sufficient to prove defendant guilty beyond a reasonable doubt. This court affirmed, reasoning that the trial court segregated the evidence applicable to each defendant and carefully evaluated the applicable evidence with respect to each defendant when rendering its determination. *Luciano I*, No. 2-09-0066, slip op. at 39-40.

¶ 33    On May 31, 2011, defendant filed his petition for postconviction relief. Among the claims defendant raised were allegations of ineffective assistance of trial counsel for not filing a motion

to dismiss based on compulsory joinder, contending that the 2007 murder charges were based on the same acts as the 1990 and 1991 weapons possession and solicitation charges to which defendant pleaded guilty. On July 25, 2011, the trial court summarily dismissed defendant's postconviction petition.

¶ 34     Defendant appealed the summary dismissal of his postconviction petition. *Luciano II*, 2013 IL App (2d) 110792. Defendant argued that his mandatory life sentence violated the prohibition on imposing mandatory life sentences on minors. He also argued that he received ineffective assistance of counsel because counsel failed to recognize, and move to dismiss, the 2007 murder charges as being founded on the same act as the 1990 and 1991 weapons and solicitation charges, which led to a violation of compulsory-joinder and speedy-trial provisions. *Id.* ¶ 41. We agreed with defendant on both points. We remanded the matter for resentencing, instructing the trial court to consider all permissible sentences. *Id.* ¶ 62. Regarding the ineffective assistance claim, we advanced the matter to the second stage, noting that defendant's arguments hinged on the factual determination of "what the State knew and when they knew it" for purposes of determining whether the 2007 murder charges were subject to compulsory joinder to the 1990 and 1991 possession and solicitation charges. *Id.* ¶ 86.

¶ 35     Once the cause was remanded, the trial court proceeded to the resentencing. Defendant received a 50-year term of imprisonment, from which he appealed. *People v. Luciano*, No. 2-17-0236 (*Luciano III*). Because the postconviction proceedings were still pending as part of the remand from *Luciano II*, we held *Luciano III* in abeyance, reasoning that there was a reasonable probability that the result of the postconviction proceedings would obviate the need to decide the issues raised in *Luciano III*. We ordered defendant to provide us with periodic reports on the status of the postconviction proceedings.

¶ 36    On April 17, 2019, defendant, through counsel, filed an amended postconviction petition. The amended petition included claims of ineffective assistance of trial and appellate counsel. Defendant alleged that trial counsel provided ineffective assistance by failing to file a motion to dismiss the 2007 murder charges because they were based on the same act as the 1990 and 1991 weapons possession and solicitation charges and were therefore subject to compulsory joinder. Defendant alleged that appellate counsel provided ineffective assistance by failing to raise the compulsory-joinder issue on direct appeal. On September 4, 2019, the State filed its motion to dismiss defendant's amended petition for postconviction relief.

¶ 37    On January 20, 2021, following delays caused by the COVID-19 pandemic, the trial court heard the State's motion to dismiss. In that hearing, the State did not advance an affirmative defense, but instead argued that the 1990 and 1991 charges were not based on the same act as the 2007 murder charges. Specifically, the State argued that the solicitation charge was based on defendant's alleged instruction to Hector Rodriguez, which occurred on a different date than the gang meetings that were emphasized at the trial on the 2007 murder charges. The State also argued that, in 1990 and 1991, it only "suspected," rather than had "knowledge," that defendant was involved in the Gonzalez murder, and the 2007 murder charges therefore were not subject to compulsory joinder. For his part, defendant argued that his actions constituted a part of a continuing solicitation and ongoing conspiracy to kill Gonzalez, which was known to the State.

¶ 38    On April 5, 2021, the trial court denied the State's motion to dismiss. The court focused on the compulsory-joinder issue between the 1990 and 1991 weapons and solicitation charges and the 2007 murder charges. The matter advanced to the third-stage hearing, with the court describing the issues as, "What did the State know when they first charged [defendant], who knew it, and what were the circumstances that they didn't charge the murder."

¶ 39    On February 17, 2022, the trial court held the third-stage hearing on defendant's amended postconviction petition. Neither party presented in-person testimony; instead the parties relied on purely documentary evidence. After defendant presented his case-in-chief, the State moved for a directed finding, arguing that defendant's evidence did not demonstrate that the State "knew" (for purposes of compulsory joinder) the identity of the actual shooter. According to the State, under our *Luciano II* decision, joinder was required only if the State had sufficient "admissible substantive evidence" to "secure a conviction," rather than simply adequate evidence with which to charge defendant. The trial court denied the State's motion for a directed finding.

¶ 40    The State continued to focus on the identity of the actual shooter or shooters. The State maintained that it needed "admissible substantive evidence which identifies the shooter" before the 2007 murder charges were subject to compulsory joinder. The State acknowledged that it could have charged defendant in 1991 with the solicitation of the actual shooter or shooters and that it might have been able to secure a conviction for murder, based on circumstantial evidence without proving the identity of the shooter or shooters. However, the State maintained that it was not required to join the murder charges prematurely, based on only the possibility of prevailing.

¶ 41    On March 25, 2022, the trial court rendered its determination. The court first evaluated the evidence presented in the third-stage hearing, noting that the search warrants presented were uniformly seeking weapons at locations associated with Angel Luciano, defendant, Acevedo, Hernandez, Oliva, Delatorre, and others. The search warrants sought evidence related to the Gonzalez murder, with the court expressly noting, "Never do I have a search warrant for the possession of weapons." The court also recounted the various police reports, witness interviews, and cooperating witness statements, particularly, Hector Rodriguez's description of the meeting at which defendant passed out the weapons and ordered certain members to shoot Gonzalez.

¶ 42    The trial court also discussed the 1990 and 1991 indictments for the possession and solicitation offenses and defendant's guilty plea. Specifically, the court referenced comments made by the sentencing judge "about potential accountability [*i.e.*, possible future ramifications and charges]," noting that "other comments were also made by defense counsel and the State; not getting to the heart of the nature, but acknowledging that the guns were used in the murder."

¶ 43    The trial court then discussed its judgment:

"this Court has to determine, as I said under *Strickland*, whether or not a constitutional violation occurred.

        Normally on a third stage post-conviction petition the relief sought is a new trial. That's not the case here.

        As the Appellate court said when they decided to tell me to peel the onion from the inside out, I think is the words that they used, the question becomes, what did the State know and when did they know it and was there enough to charge him? Not was there enough to actually convict him, but was there enough to charge when they charged him with that [*sic*]?

        I'm at a unique posture in this case because I have not yet had filed a mandatory joinder motion because it's not been allowed. We're at a post-conviction petition.

        However, it is going to be the finding of this Court with everything I have in front of me, we have argued whether or not [defendant] could have been charged by accountability, that's the only way he could have been charged in [this] case. The defense has pretty much conceded the guilt of [defendant]. They haven't said that directly but they pretty much conceded that for purposes of this motion.

        The State has pretty much conceded that if mandatory joinder applies, this case is over and the murder conviction would be vacated on speedy trial grounds.

What I am finding today is as follows, because of the procedural history of this case and I somewhat disagree with the Appellate Court, I have not heard at this point any of the witnesses from the State as to what they knew and when they knew it.

What I have heard is the documentary evidence leading up to this, to determine whether or not ineffective assistance occurred by not filing the motion for joinder.

What I see here is as follows: I do not see that there is any trial strategy that this court can come up with. And I will tell you for the record so that it's clear, this Court did criminal defense work for 25 years before it took the bench and sat in felony court until recently getting the assignment to be presiding judge of family court, sat in felony court for about six and a half years.

On my experience, even if [defendant] did not tell his attorney about the gun case, I cannot fathom a trial strategy that you would not go back and look into the history, to see what happened on a 1990 murder when this is charged in 2007 and figure out what's going on. It's incumbent upon defense attorneys to research. That was obviously not done in this case.

There is no trial strategy for never filing a motion for compulsory joinder if you think it is there as we all know. [Worst] thing that happens is if you don't file it, the answer is always no.

I can't think of a trial strategy that said, don't file a joinder that could have killed the case off immediately.

So I do find under the first prong of *Strickland* that ineffective assistance occurred.

As to the second prong of *Strickland* whether or not, and I know I'm paraphrasing, there's a reasonable possibility that had the motion been filed, it would have been successful. I have to find that there's a reasonable possibility.

This court can make a reasonable argument as to accountability in this case and that at the time the gun cases were charged, there's a real possibility the State had enough information based upon, if nothing else, Mr. Rodriguez's comments that [defendant] who's sitting in front of me, was accountable. If nothing else, he handled the guns, he ordered people to go shoot Deuce house[s]. He said Psycho was going to get hit. And he took the guns back and wiped them clean. And if I'm not mistaken, one of his fingerprints ended up on one of the guns. By accountability, I believe that there may have been enough.

However, so the relief I'm granting is as follows, because I find that the second prong of *Strickland* was met too. But I don't have a motion for joinder in the file. And I am not prepared today to find specifically that joinder must apply. This Court has never heard from any of the witnesses at the time.

And I know the witnesses, Mr. Johnson, who was the state's attorney is still alive, the prosecuting attorney Mr. Crimmins is still alive and they're both practicing law. I just bring that up because in the future we may hear from them.

So I am granting the third stage.

I am not vacating the conviction. And the reason I'm not vacating the conviction in this case is, quite frankly, I don't think it's appropriate based on the arguments I have.

There's a tacit admission that this is a joinder and that, therefore, I find that the trial was appropriate. I find the facts of the trial were appropriate. And I find that the finding of the jury was an appropriate finding, based upon the facts of this case.

This is a procedural question that should a motion [have] been filed, and I find that it should have been. So I'm not going to vacate the conviction in this case.

But what I am going to do is grant the third stage and grant the Defense leave, if they so desire, they may not, but if they so desire grant them to [*sic*] leave to file a mandatory joinder or compulsory joinder motion and have that heard."

¶ 44 On March 25, 2022, the trial court entered a handwritten order that stated: "Reassignment following the court's granting of 3rd stage evidentiary hearing & continuance to allow defense [to] file motion to dismiss based on compulsory joinder." On March 28, 2022, the court entered two written status orders stating, relevantly, "On 3/25/2022, [the trial court] found trial counsel was ineffective under both prongs of *Strickland* but did not vacate the conviction. [The trial court] continued the case for defense counsel to file a motion to dismiss the indictment and for a hearing on that motion." The trial court also tolled the 30-day period for defendant to file the motion for compulsory joinder until April 11, 2022. On April 5, 2022, the State timely filed its notice of appeal.

¶ 45                                      II. ANALYSIS

¶ 46 On appeal, the State argues that the trial court improperly granted postconviction relief to defendant. First, the State contends that the trial court did not actually decide the amended postconviction petition in defendant's favor. Second, the State contends that, in any event, the 2007 murder charges were not subject to compulsory joinder because (1) they were not based on the same act as the 1990 and 1991 possession and solicitation charges and (2) the State did not have a reasonable chance of securing a murder conviction based on what it knew when the 1990 and 1991 charges were filed.

¶ 47                    A. Postconviction Proceedings and Standard of Review

¶ 48 The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)) describes how postconviction proceedings are to be conducted. A postconviction proceeding allows an individual convicted of a criminal offense to challenge his or her conviction on the grounds of a

constitutional violation. *People v. Domagala*, 2013 IL 113688, ¶ 32. It provides for up to three stages of review. *Id.* In the first stage, the defendant is required only to set forth the gist of a constitutional deprivation, and the trial court may summarily dismiss the petition if it is frivolous or patently without merit. *Id.* If the petition is not summarily dismissed, it is advanced to the second stage, in which counsel may be appointed to assist the defendant, and the petition and its accompanying documentation must make a substantial showing of a constitutional violation. *Id.* ¶ 33. If the petition survives the second stage, it advances to the third and final stage, where the defendant is entitled to an evidentiary hearing. *Id.* ¶ 34.

¶ 49    At the third-stage hearing, the trial court serves as the fact finder, and it determines the credibility of witnesses and the weight to be given to evidence and it resolves any evidentiary conflicts. *Id.* Ultimately, the court must determine whether the evidence introduced in the third-stage hearing demonstrates that the defendant is, in fact, entitled to relief. *Id.* A defendant is entitled to relief if he or she proves, by a preponderance of the evidence, that a constitutional right has been violated. *People v. Coleman*, 2013 IL 113307, ¶ 92.

¶ 50    As noted above, defendant's postconviction petition was advanced to the third stage and the parties submitted documentary evidence. The trial court evaluated the documentary evidence, heard the parties' arguments, and rendered its decision. The parties dispute the standard of review. Defendant argues that the typical post-evidentiary-hearing standard of deference, the manifest-error standard, applies. *People v. English*, 2013 IL 112890, ¶ 23. Defendant contends that fairness requires a deferential review because the court considered new evidence, albeit documentary, and made factual determinations based on its review. See *People v. Brown*, 2013 IL App (1st) 091009, ¶ 53 (manifest-error standard applied where the trial court considered new documentary evidence entered by stipulation at the third-stage hearing; additionally, the trial court presided over the defendant's trial).

¶ 51      The State argues that our review is more appropriately *de novo* where the trial court considered only documentary evidence and the issues presented are purely questions of law. See *English*, 2013 IL 112890, ¶ 23. However, even in these circumstances, deferential review is required if the trial court has some special expertise or familiarity with the defendant's trial or sentencing and that familiarity has some bearing upon the disposition of the postconviction petition. *Id.* The State argues that this exception does not apply in this case: the parties presented only documentary evidence at the third-stage hearing, the evidence concerned the legal issue of whether defendant's trial and appellate counsel were ineffective, and the trial court neither had special expertise nor presided over the trial or sentencing of defendant.

¶ 52      We agree with the State that our review of the trial court's third-stage determination is *de novo*. We note that defendant relies upon *Brown* but ignores the detail that the trial court in that case also presided over the *Brown* defendant's trial. *Brown*, 2013 IL App (1st) 091009, ¶ 53. Thus, the *Brown* court applied the deferential manifest-error standard in significant part because the trial court had presided over the underlying trial. Here, while the trial court did consider and evaluate new documentary evidence, it did not have the necessary special expertise or involvement in the underlying trial or sentencing to qualify for the exception carved out in *English*. In any event, the standard of review does not affect the outcome in this case—the result remains the same whether we employ deferential or plenary review.

¶ 53                                        B. Compulsory Joinder

¶ 54      In *Luciano II*, 2013 IL App (2d) 110792, ¶ 66, we termed the issues presented in defendant's ineffective assistance claim "something of an analytical onion," due to the layering of the various components of his claims. Defendant's postconviction petition alleged claims of ineffective assistance against trial and appellate counsel. The ineffective assistance claims, in turn, were based on trial counsel's failure to file a motion to dismiss based on compulsory joinder (720

ILCS 5/3-3 (West 2006)) and appellate counsel's failure to raise on direct appeal an ineffective assistance claim against trial counsel for that failure. In turn, by not seeking compulsory joinder, defendant's right to a speedy trial was compromised because the 1990 and 1991 weapons possession and solicitation charges constituted the same acts used to prove the 2007 murder charges and thus, when the 2007 murder charges were instituted, the speedy-trial period, both statutory and constitutional, had long since lapsed. Therefore, the heart of defendant's claim in this appeal, on which any relief succeeds or fails, is the compulsory-joinder issue. We therefore address this issue first, because, if it fails, then none of the other layers of defendant's claim can succeed; but if it succeeds, then we can move on to the next layer of our "analytical onion."

¶ 55    The compulsory-joinder statute provides: "If the several offenses are known to the proper prosecuting officer at the time of commencing the prosecution and are within the jurisdiction of a single court, they must be prosecuted in a single prosecution *** if they are based on the same act." 720 ILCS 5/3-3(b) (West 2006). There are two key concepts relevant to our consideration here: "knowledge" or "known to the proper prosecuting officer" and "based on the same act." Knowledge for compulsory-joinder purposes means "the conscious awareness of evidence that is sufficient to give the State a reasonable chance to secure a conviction." *Luciano II*, 2013 IL App (2d) 110792, ¶ 78; see also *People v. McBride*, 2022 IL App (4th) 220301, ¶ 41.[3] We conclude that the State had "knowledge" under the compulsory-joinder statute.

¶ 56    When defendant was charged in 1990 and 1991, especially in 1991 for solicitation of aggravated discharge, the State had evidence, provided by Hector Rodriguez, that defendant had instructed Rodriguez and others to shoot Gonzalez, distributed weapons for that purpose, been

---

[3]In December 2022, after briefing concluded, defendant filed a motion to cite this case as additional authority and the State did not object. We hereby grant defendant's motion.

aware of the shooting immediately after it occurred, collected the weapons after the shooting, attempted to secrete the weapons, and possessed the actual weapons used in the shooting. Analysis of the weapons found in defendant's possession showed that the .30-30 Marlin rifle and the Ted Williams shotgun were used in the shooting and the Commando Mark .45-caliber rifle had defendant's fingerprint on it. Rodriguez also informed the police that defendant gave him the Commando Mark .45-caliber rifle and instructed him to shoot Gonzalez. In addition, Acevedo told police at that time that several men, who were identified in Rodriguez's statements to police as possible shooters, came to his house and used the outside spigot to wash their faces.

¶ 57    As the case developed, the police focused on Rangel as one of the shooters, and Rangel was charged with Gonzalez's murder. Rangel's murder charge was founded in significant part on Hector Rodriguez's statements but was torpedoed by Acevedo's perjury. Notwithstanding the State's failure to convict Rangel, the State used the Rodriguez information at defendant's sentencing on the 1990 and 1991 possession charges as evidence in aggravation to support a longer sentence. This evidence shows that the State had the requisite knowledge to charge defendant with murder, certainly by the time it secured the 1991 indictment for weapons possession and solicitation.

¶ 58    We next turn to the "based on the same act" concept. Our supreme court observed that the compulsory-joinder statute was enacted to prevent the State from embarking on a piecemeal and harassing prosecution of multiple offenses. *People v. Hunter*, 2013 IL 114100, ¶ 18. For purposes of compulsory joinder, "based on the same act" is not given "a hypertechnical interpretation to create multiple acts based on discrete moments in time"; instead, where the defendant is engaged in a single and uninterrupted act, joinder will be required. *Id.* Our supreme court cautioned against adopting an elements-based test when determining whether joinder is required versus other situations, such as when determining whether multiple convictions are supported by separate acts.

*Id.* ¶ 22. Indeed, our supreme court expressly overruled cases in which courts had erroneously used a one-act-one-crime definition of "act" in the context of compulsory joinder. *Id.* (overruling *People v. Davis*, 381 Ill. App. 3d 614 (2008), and *People v. Davis*, 328 Ill. App. 3d 411 (2002)).

¶ 59     With this understanding of "based on the same act" in mind, it is clear that the 1991 charges in case No. 91-CF-797 are based on the same act as the 2007 murder charges. The statement from Hector Rodriguez indicated that defendant held a cache of weapons that he distributed to various gang members attending a meeting before Halloween 1990. At that meeting, defendant instructed the members to shoot members of the Insane Deuces generally and Gonzalez specifically. Defendant also distributed the weapons to the members for that purpose. At the trial on the 2007 murder charges, more witnesses came forward to corroborate Rodriguez's description of the meeting at which defendant distributed the weapons and gave the members their assignments. This act—conducting the meeting, distributing the weapons, and giving the instructions—forms the foundation of both the solicitation of aggravated discharge offense and the 2007 murder charges. Because both the 1990 and 1991 charges and the 2007 charges were "based on the same act" for purposes of the compulsory-joinder statute, the State, which, as we have determined above, had "knowledge" of the facts, was required to prosecute the murder charges together with the possession and solicitation charges.

¶ 60     Having determined that joinder was required, we can now move to the next layer. The interplay between compulsory joinder and speedy-trial rights is governed by the *Williams* rule:

"Where new and additional charges arise from the same facts as did the original charges and the State had knowledge of these facts at the commencement of the prosecution, the time within which trial is to begin on the new and additional charges is subject to the same statutory limitation that is applied to the original charges. Continuances obtained in connection with the trial of the original charges cannot be attributed to

defendants with respect to the new and additional charges because these new and additional charges were not before the court when those continuances were obtained." *People v. Williams*, 94 Ill. App. 3d 241, 248-49 (1981).

Here, because the 2007 murder charges were subject to compulsory joinder with the 1990 and 1991 weapons possession and solicitation charges, the speedy-trial term began to run at that time. Approximately 16 years elapsed between when the State had "knowledge" of the murder charges and when it instituted the murder charges, and defendant's murder prosecution was subject to dismissal on speedy-trial grounds.

¶ 61 Next, in 2007, had defendant filed a motion to dismiss based on compulsory joinder, it would have been granted. Because the speedy-trial term had long since lapsed, the prosecution on the 2007 murder charges would have been dismissed. It is on this failure to file a motion to dismiss that defendant bases his postconviction claims of ineffective assistance. To prevail on a claim of ineffective assistance, a defendant must show both that his or her counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that the result of the proceeding would have been different but for counsel's deficient performance. *People v. Jones*, 2023 IL 127810, ¶ 51. Counsel's strategic decisions are generally immune from ineffective assistance claims. *Id.*

¶ 62 Here, the trial court could find no strategic reason for not filing a motion to dismiss. We, too, discern no strategic purpose in failing to file a motion to dismiss. As we determined above, a motion to dismiss based on compulsory joinder would have been successful. Defendant's murder charges, therefore, would have been dismissed. Trial counsel's representation, therefore, was objectively deficient. Defendant was also prejudiced because, had the motion been filed, the 2007 murder charges would have been dismissed on compulsory-joinder/speedy-trial grounds. Thus, we agree with the trial court that trial counsel provided ineffective assistance.

¶ 63    Likewise, the same rubric applies to appellate counsel. We can discern no strategic reason not to include the issue of trial counsel's failure to file a motion to dismiss. Therefore, appellate counsel's failure to raise this issue in the direct appeal was objectively deficient. Further, defendant was also prejudiced on direct appeal in at least two ways. First, the issue of ineffective assistance of trial counsel for failing to file a motion to dismiss based on compulsory joinder would have been successful. This alone establishes prejudice because the outcome of defendant's direct appeal would have been different. Second, by failing to raise the issue on direct appeal, appellate counsel has potentially forfeited its consideration in future proceedings. Indeed, it is only through an ineffective assistance claim against appellate counsel that we are able to consider the compulsory-joinder issue, because it could, and should, have been raised on direct appeal. Thus, appellate counsel, too, provided ineffective assistance.

¶ 64    Finally, we consider the relief ordered by the trial court. The court unequivocally granted defendant relief following the third-stage evidentiary hearing. In its oral remarks, the court stated that it would "grant the third stage and grant the Defense leave, if they so desire, they may not, but if they so desire grant them to [*sic*] leave to file a mandatory joinder or compulsory joinder motion and have that heard." The court appears to have believed that it needed to entertain the actual motion to dismiss despite necessarily deciding that, had counsel filed the motion to dismiss, defendant was reasonably likely to prevail. In other words, although the court determined that compulsory joinder applied and that the motion to dismiss the murder charges would have succeeded based on the 16-year speedy-trial violation, it granted leave to present a motion that it had already determined would be successful.

¶ 65    We believe that the trial court erred in choosing this relief. Effectively, the court's relief was a do-over on the third-stage evidentiary hearing because the completed third-stage evidentiary hearing covered precisely the issue of whether a motion to dismiss based on compulsory-

joinder/speedy-trial grounds would have succeeded. While neither the parties' nor our own research has revealed the relief to be granted in a procedurally similar case, the relief granted in direct appeals for this situation is uniform and compelling. For example, in *People v. Williams*, 204 Ill. 2d 191, 207-08 (2003), our supreme court reversed the defendant's murder conviction where counsel failed to move to dismiss on compulsory-joinder/speedy-trial grounds. See also *People v. Isbell*, 2020 IL App (3d) 180279, ¶¶ 13, 29 ("when a defendant raises an ineffectiveness claim on [failing to file a motion to dismiss], we must only consider whether a motion to dismiss charges on speedy trial grounds, had it been filed by counsel, would have been meritorious. [Citation.] The remedy for ineffective assistance in this regard is the same as the remedy for any speedy trial violation found on appeal: outright reversal of the conviction or convictions in question"; conviction subject to compulsory joinder reversed). Thus, the proper remedy here was to reverse and vacate defendant's conviction of the 2007 murder charges. Accordingly, we modify the court's judgment and reverse and vacate defendant's conviction in this case.

¶ 66                             C. The State's Contentions

¶ 67    The State argues that the trial court actually determined that defendant had not demonstrated that his trial counsel provided ineffective assistance and that the court erred in not denying defendant postconviction relief. The State also challenges the court's findings that the 2007 murder charges were based on the same act as the 1990 and 1991 charges and that it had a reasonable chance to secure a conviction based on its knowledge in 1990 and 1991. We consider the contentions in turn.

¶ 68                      1. Erroneous Grant of Postconviction Relief

¶ 69    The State initially argues that the trial court's chosen relief actually means that defendant failed to prove prejudice. As we have discussed above, the trial court unequivocally granted defendant postconviction relief based on a determination that trial counsel provided ineffective

assistance. The trial court determined both that trial counsel provided objectively deficient representation by failing to file a motion to dismiss based on compulsory joinder and the concomitant speedy-trial violation and that this failure prejudiced defendant because the motion to dismiss would likely have succeeded. The trial court, however, did not order the proper relief; rather, it effectively ordered a repeat of the third-stage evidentiary hearing, despite having necessarily determined that a motion to dismiss had a reasonable probability of succeeding. Thus, the State conflates the relief granted with the success of the petition.

¶ 70    Notwithstanding the type of relief, the trial court inescapably granted defendant's postconviction petition. The court determined that defendant prevailed on his claim of ineffective assistance, and it very clearly ordered relief in favor of defendant. We reject the State's claim that relief is not relief.

¶ 71    The State concedes that, if the 2007 murder charges were subject to compulsory joinder, then "defendant's murder prosecution would have been barred by speedy trial principles where the [State] brought the murder charges after the 160-day speedy-trial period had expired." The State nevertheless reasons that, because the relief granted by the trial court was not the vacation of defendant's murder conviction, "the court necessarily found that defendant had not proven that his compulsory joinder argument would have succeeded." We disagree.

¶ 72    On March 25, 2022, the trial court entered an order stating: "Reassignment following the court's granting of 3rd stage evidentiary hearing & continuance to allow defense [to] file motion to dismiss based on compulsory joinder." On March 28, 2022, the court entered two orders. Both orders stated: "On 3/25/2022, [the trial court] found trial counsel was ineffective under both prongs of *Strickland* but did not vacate [defendant's] conviction." Both orders referenced that defendant was granted leave to file a motion to dismiss based on compulsory joinder. Thus, for purposes of the postconviction proceedings, the court clearly determined that trial counsel had provided

ineffective assistance since both prongs of *Strickland* had been satisfied. The court then granted the relief, albeit incorrect, of granting defendant leave to file the very motion to dismiss that was the subject of the postconviction proceedings. The court's written orders directly refute the State's contention.

¶ 73 Similarly, the trial court's oral remarks directly refute the State's contention. To the exclusion of everything else that the trial court said from the bench, the State focuses on a single sentence in the March 25, 2022, transcript: "And the reason I'm not vacating the conviction in this case is, quite frankly, I don't think it's appropriate based on the argument I have." The State ignores that the trial court stated that it "[found under the first prong of *Strickland*] that ineffective assistance occurred." The State ignores that the trial court stated: "there's a real possibility the State had enough information based upon, if nothing else, Mr. Rodriguez's comments that [defendant], who's sitting in front of me, was accountable [for Gonzalez's murder]." The State ignores that the trial court stated, "I am granting the third stage," and proceeded to order the relief of "leave to file a mandatory joinder or compulsory joinder motion and have that heard." Thus, the oral statements and the written orders all reflect the trial court's judgment of granting defendant's postconviction petition following the third-stage hearing.

¶ 74 Finally, we note that the State agrees with our assessment of the correct relief to be ordered in this case. As mentioned, the State concedes that, "if compulsory joinder applied, defendant's murder prosecution would have been barred by speedy trial principles where the [State] brought the murder charges after the 160-day speedy-trial period had expired." We have determined that compulsory joinder did indeed apply to the 2007 murder charges, and we accept the State's concession. Further, we reject the State's contention that the trial court did not grant defendant's postconviction petition, because the record directly and completely refutes the State's argument.

¶ 75 2. Same Act Supporting 1990 and 1991 Charges and 2007 Murder Charges

¶ 76 The State disputes that the two sets of charges, the 1990 and 1991 possession and solicitation charges and the 2007 murder charges, were based on the same act. As an initial matter, we note that, in defendant's guilty plea to the 1990 and 1991 possession charges, the State argued that consecutive sentencing was available, not because each count to which defendant was pleading guilty constituted a separate act, but because defendant was dangerous and consecutive sentences would protect the public from defendant. See Ill. Rev. Stat. 1991, ch. 38, ¶ 1005-8-4(b) (now 730 ILCS 5/5-8-4(c)(1) (West 2020)). At the sentencing, the trial court specifically rejected that the acts of possession constituted different acts and, instead, determined that the possession constituted "an ongoing series of events and that consecutive sentencing [was] not available." In the trial on the 2007 murder charges, the State argued that defendant possessed the weapons before, during, and after the Gonzalez shooting. The trial court determined that defendant's possession of the weapons used in the shooting supported his conviction of Gonzalez's murder. *Luciano I*, No. 2-09-0066, slip op. at 29-30. The State also used defendant's guilty plea as evidence of his possession of the weapons used in the murder (*id.* at 37), and, we note, this evidence was deemed effectively a single, continuing, act that would not support consecutive sentencing for separate acts of possession. In this appeal, however, the State now argues that defendant's murder conviction was founded on separate acts of possession and separate acts of encouragement to the members to shoot and kill Gonzalez. This argument constitutes a significant and first-time change in position, from asserting a single act to multiple acts.

¶ 77 The doctrine of judicial estoppel operates to protect the integrity of the judicial process from parties deliberately changing their positions based on the exigencies of the moment. *People v. Palmer*, 2021 IL 125621, ¶ 74. Generally, judicial estoppel will apply when a party "has (1) taken two positions (2) that are factually inconsistent (3) in separate judicial or quasi-judicial administrative proceedings, (4) intending for the trier of fact to accept the truth of the facts alleged

and (5) having succeeded in the first proceeding and received some benefit from it." *Id.* The fact that all the factors are established does not always require the application of judicial estoppel—the court may exercise its discretion in making the determination and it may also consider whether the party intended to deceive or mislead, whether the party's change in position was due to inadvertence or mistake, and the impact of the party's original position in the first proceeding. *Seymour v. Collins*, 2015 IL 118432, ¶ 47.

¶ 78    We believe that judicial estoppel could be invoked under the circumstances of this case. The State's consistent theory from 1990 through the trial on the 2007 murder charges was that defendant's possession of the weapons used in the murder was a continuing act, which served as the foundation of the murder charges. It is only in this appeal (and the third-stage postconviction proceedings below) that the State has changed its position from asserting an ongoing act of possession to contending discrete acts of possession that render the murder charges not subject to compulsory joinder. The latter position is factually inconsistent with the former position, taken in the 1991 guilty plea and the murder trial (which also used defendant's guilty plea to establish his ongoing possession of the weapons and his ability to distribute the weapons he possessed). Moreover, the State obtained a murder conviction based on its earlier theory, and it now jettisons that theory. Thus, the record manifestly and clearly establishes each of the elements necessary to apply the doctrine of judicial estoppel. *Palmer*, 2021 IL 125621, ¶ 74.

¶ 79    Nevertheless, although the doctrine could, and perhaps should, apply to prohibit the State's argument that defendant's 1990 and 1991 possession and solicitation charges and 2007 murder charges were based on different acts, we do not decide this case on that basis. Neither party appears to have raised the issue below, and the trial court made neither findings concerning the elements nor a determination whether the doctrine should be applied. While it is well established that we may sustain the trial court's judgment on any basis supported in the record (*People v. Aljohani*,

2022 IL 127037, ¶ 28), we believe it would not be appropriate to decide this case on an unbriefed, albeit manifestly apparent, rationale. We therefore turn to the State's specific contentions.

¶ 80    The State argues that the 1991 solicitation charge was not based on the same act as the 2007 murder charges, because the solicitation charge focused on Hector Rodriguez. The State does not explain how the 1991 solicitation charge differs from the 2007 murder charges, but we infer that the State is suggesting that the murder charges were based on the instructions to the other individuals. However, at the same time and in the same meeting, defendant instructed members, including Hector Rodriguez, Michael Rodriguez, Delatorre, and Rangel, to carry out the Gonzalez shooting. Under *Hunter*, the simultaneous instructing of these individuals is the same act for purposes of compulsory joinder. *Hunter*, 2013 IL 114100, ¶ 27.

¶ 81    The State relies on *People v. Gooden*, 189 Ill. 2d 209, 219 (2000), to support its contention that the act of soliciting Hector Rodriguez to commit aggravated discharge of a firearm is not the same act for compulsory-joinder purposes as instructing others, including Delatorre and Rangel, to shoot Insane Deuces generally and to shoot Gonzalez specifically. In *Gooden*, our supreme court held that an aggravated criminal sexual assault committed after the defendant had committed a home invasion by breaking into his ex-wife's residence and injuring her by hitting her with a shotgun were separate acts and not subject to compulsory joinder even though they occurred during the same incident. *Id.* at 220. *Gooden* is distinguishable, however, because the evidence in this case showed a single act, where Hector Rodriguez and the other gang members, including those who shot Gonzalez, were all instructed at the same meeting. See *Hunter*, 2013 IL 114100, ¶ 27 (simultaneously possessing cannabis and firearms discovered during the same search deemed a single physical act for purposes of compulsory joinder). Because the solicitation and the murder charges were based on defendant's instructing the gang members to carry out the shooting of Gonzalez, they were based on the same act (*id.*), and we reject the State's contention.

¶ 82                             3. The State's Knowledge

¶ 83    The State denies that it had sufficient "knowledge" for purposes of compulsory joinder. The State argues that the trial court employed an incorrect standard by focusing on whether the State "knew" enough to charge defendant with murder instead of whether the State could "secure a conviction for murder." The State contends that it did not possess "substantively admissible evidence identifying the [actual] shooter" or connecting the actual shooter to defendant at the time it instituted the 1990 and 1991 charges, so it "could not prove that defendant was accountable for the acts of the shooter."

¶ 84    This argument subtly misstates "knowledge" for purposes of compulsory joinder. In *Luciano II*, which is also the law of this case, we stated that " 'knowledge' or 'known to the proper prosecuting officer' means the conscious awareness of evidence that is sufficient to give the State a reasonable chance to secure a conviction." *Luciano II*, 2013 IL App (2d) 110972, ¶ 78; accord, *McBride*, 2022 IL App (4th) 220301, ¶ 41; *People v. Sykes*, 2017 IL App (1st) 150023, ¶ 42. The State converts the prosecutor's "conscious awareness of evidence" into actual possession of admissible evidence, and it converts the prosecutor's confidence in the evidence from "sufficient to give the State a reasonable chance to secure a conviction" to proof beyond a reasonable doubt that defendant was accountable for the shooter's acts. This conception would impermissibly raise the standard to a degree where no prosecution would ever be subject to compulsory joinder and it would implement the very harm—piecemeal prosecutions—the compulsory-joinder statute was enacted to prevent. See *Hunter*, 2013 IL 114100, ¶ 18 (compulsory-joinder statute was enacted to prevent prosecutorial abuse through the piecemeal prosecution of multiple offenses). We reject the State's conception of "knowledge" pertaining to compulsory joinder.

¶ 85    The State recognizes that, in 2007, defendant was charged with murder and that a conviction could be obtained only under accountability principles. A defendant is legally

accountable for the acts of another if, "before or during the commission of an offense, and with the intent to promote or facilitate such commission, he [or she] solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2006); see also Ill. Rev. Stat. 1991, ch. 38, ¶ 5-2(c). In *People v. Fernandez*, 2014 IL 115527, ¶ 13, our supreme court explained that, to prove a defendant's legal accountability, the State may present evidence that the defendant shared the criminal intent with the principal, or that there was a common criminal design between the defendant and the principal. The State argues that accountability cannot be proved, and it specifically contends, relying on *People v. Johnson*, 2014 IL App (1st) 122359-B, ¶ 160, that "[o]ne cannot share an intent to facilitate or promote the commission of a crime without knowing who committed the crime." The State's contention, however, conflates the sufficiency of the evidence presented at trial with "knowledge" for purposes of compulsory joinder. In *Johnson*, the issue involved whether the defendant was accountable for the actions of Sims. The court determined that the defendant shared with Sims neither a prior intent to shoot the victim nor a common design to shoot the victim—indeed, the State failed to offer evidence that the defendant was in any way involved in the commission of the crime. *Id.* ¶ 161. Thus, the State is placing itself in the shoes of the defendant in *Johnson* in considering whether shared criminal intent was demonstrated by the evidence presented at trial when the identity of the shooter was not known. Instead, the proper issue is whether the prosecutor was aware of evidence that provided a reasonable chance of demonstrating accountability.

¶ 86    Likewise, the State makes a similar argument regarding common criminal design. Relying on *People v. Ivy*, 2015 IL App (1st) 130045, ¶ 45, the State contends that it must prove that someone with whom defendant shared a common criminal design committed the act for which defendant is being held criminally responsible. Once again, however, the State conflates the sufficiency of the evidence presented to convict defendant at trial with "knowledge" for purposes

of compulsory joinder. In *Ivy*, the issue was whether the State needed to present evidence that an accomplice of the defendant performed the shooting, and the court determined that the State had not presented any evidence concerning who shot the victim. *Id.* ¶ 46. Once again, the State places itself in the *Ivy* defendant's shoes and considers the sufficiency of the evidence presented at trial instead of assessing the evidence it possessed and whether that offered a reasonable chance of demonstrating a common design.

¶ 87     The State, therefore, by relying on *Johnson* and *Ivy*, is impermissibly attempting to conflate evidence of which the prosecutor is aware that provides the State a "reasonable chance to secure a conviction" with evidence admitted at trial that proves a defendant's guilt beyond a reasonable doubt. Again, that is neither the law of this case nor what the law actually requires. *E.g.*, *McBride*, 2022 IL App (4th) 220301, ¶ 41. We reject the State's argument.

¶ 88     To prove defendant guilty of murder, the State had to be able to prove that defendant was legally accountable for the shooters' actions. Under either the shared intent or common design doctrines, the State was aware that defendant could be proved accountable. Hector Rodriguez had informed police that defendant ran a meeting at which he passed out weapons and told the gang members present—including at least two of the shooters identified by Rodriguez and subsequently identified through the cooperating Latin King witnesses in the prosecution of the 2007 murder charges—to shoot members of the Insane Deuces generally and to shoot Gonzalez specifically. The various search warrants executed by the police led to the recovery of two of the weapons used in the shooting. Defendant's fingerprint was found on a weapon that Rodriguez expressly acknowledged that defendant gave to him. This evidence was adequate to apprise the prosecutor and to provide a reasonable chance of proving defendant accountable under either the shared intent or common design doctrines for Gonzalez's murder by the actual shooters.

¶ 89　　The State provides a recitation of the evidence it contends was known to prosecutors in 1990 and 1991. The State's recitation, however, focuses on the sufficiency of the evidence and whether it provides proof beyond a reasonable doubt that defendant was accountable for and guilty of Gonzalez's murder, much like the cases it cited in support of its position. As we have discussed, this is the wrong lens through which to view "knowledge" for purposes of compulsory joinder. As such, we reject the State's improper framework and discussion. We instead conclude, based on our analysis above, that the evidence known to the State at the time of the 1990 and 1991 weapons possession and solicitation charges provided a reasonable chance to secure a murder conviction against defendant.

¶ 90　　　　　　　　　　　　　　　4. Final Considerations

¶ 91　　There are two more considerations that were raised at oral argument that bear discussion here. First, while this appeal deals with the ineffective assistance provided by trial counsel and appellate counsel, we note that the performance of guilty-plea counsel has not been challenged, and we presume he provided competent representation. *E.g.*, *People v. Petrie*, 2021 IL App (2d) 190213, ¶ 66 (counsel's actions are presumed to be the product of sound strategy). This competence would extend to the effect of the guilty plea on future actions. At oral argument, the State did not dispute that, on the date of defendant's guilty plea, the 120-day speedy trial term had lapsed. The lapse of the term would have prohibited a subsequent prosecution for Gonzalez's murder based on the acts charged in the nol-prossed solicitation of aggravated discharge count in the 1991 case. This understanding was further reflected in defendant's statement in allocution, in which he expressed the hope of "get[ting] this time in [his] past to start on [his] life again." The understanding that the acts on which the solicitation charge was based could not be used to support a future murder charge is also reflected in the fact that the State did not qualify the guilty plea in any way to preserve its right, should more and better information come to light, to later seek to

charge defendant with Gonzalez's murder. For example, the State could have easily made such a reservation a part of the guilty-plea record, but it did not do so. Instead, it sought and received the maximum sentence for weapons possession, and it sought to make defendant's sentences consecutive because of his danger to the public, which the trial court rejected. Thus, flowing from the presumption of competent representation and effective performance by both defendant's plea counsel and the prosecutors in the 1990 and 1991 cases, it is apparent that, at the time of the 1991 guilty plea, the State had concluded all charges stemming from the acts depicted in the nol-prossed solicitation charge.

¶ 92    Our final point is to highlight our disagreement with the State's argument on appeal and at oral argument that "[t]here is nothing in compulsory joinder jurisprudence which imposes a duty upon the [State] to seek out evidence that may or may not ultimately be available." At oral argument, the State persisted in this position even when we bluntly asked if its argument meant that doing nothing to improve its knowledge and evidence regarding the case was proper and acceptable. While not binding, we note that a prosecutor is expected to investigate and prosecute offenses where appropriate. See ABA Criminal Justice Standards: Prosecution Function § 3-4.1 (4th ed. 2017), https://www.americanbar.org/groups/criminal_justice/standards/Prosecution FunctionFourthEdition/ (last visited May 12, 2023) [https://perma.cc/X4J4-9GCP]; ABA Criminal Justice Standards: Prosecutorial Investigations (3d ed. 2014), https://www.americanbar.org/groups/criminal_justice/publications/criminal_justice_section_arch ive/crimjust_standards_pinvestigate/ (last visited May 12, 2023) [https://perma.cc/L4DY-CADU]. We believe that the State had sufficient evidence to charge defendant with Gonzalez's murder no later than when it focused on bringing Rangel to trial, and it had the obligation to do more than nothing to investigate defendant's culpability for Gonzalez's murder. Because the State chose to do nothing, by either contemporaneously investigating to bolster its case or reserving its right and

ability to later charge defendant in Gonzalez's murder notwithstanding the acts alleged in the count for solicitation of aggravated discharge, we are compelled to answer the question of whether compulsory joinder applied to the 2007 murder charges and to determine the consequences flowing from our answer.

¶ 93                                        III. CONCLUSION

¶ 94     For the foregoing reasons, we affirm as modified the judgment of the circuit court of Kane County. Defendant's conviction is reversed and vacated.

¶ 95     Affirmed as modified.

***People v. Luciano*, 2023 IL App (2d) 220112**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 07-CF-1753; the Hon. Donald Tegeler Jr., Judge, presiding. |
| **Attorneys for Appellant:** | Jamie L. Mosser, State's Attorney, of St. Charles (Janet C. Mahoney, Assistant State's Attorney, and Patrick Delfino, Edward R. Psenicka, and Katrina M. Kuhn, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| **Attorneys for Appellee:** | James E. Chadd, Douglas R. Hoff, and Jonathan Yeasting, of State Appellate Defender's Office, of Chicago, for appellant. |