2023 IL App (1st) 221028-U

No. 1-22-1028

Order filed July 17, 2023.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 17803 |
| | ) | |
| WILLIE WILLIAMS, | ) | The Honorable |
| | ) | Alfredo Maldonado & |
| Defendant-Appellant. | ) | Clayton J. Crane, |
| | ) | Judges Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Justice Coghlan concurred in the judgment.
Justice Pucinski specially concurred.

**ORDER**

¶ 1   *Held*: The trial court properly granted the State's motion to dismiss defendant's postconviction claim that counsel failed to present a witness on his behalf. Additionally, the court properly denied defendant's claim that trial counsel usurped his right to choose a bench trial.

¶ 2   Following a jury trial, defendant Willie Williams was convicted of two counts of

aggravated criminal sexual assault that occurred against T.K. on September 7, 2009. Defendant

ultimately filed a postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS

5/122-1 *et seq.* (West 2016)), alleging that trial counsel (1) failed to call a certain witness to corroborate his defense, and (2) usurped his right to choose a bench trial. The trial court dismissed the first claim on the State's motion and denied the second following an evidentiary hearing. For the following reasons, we affirm both rulings.

¶ 3                                                I.  Background

¶ 4        At trial, T.K. testified that on the day in question, she was walking through side streets toward Commercial Avenue while carrying two dime bags of crack, a crack pipe, a lighter, napkins and a tampon, as she was menstruating at that time. According to T.K., who had two convictions for possession of a controlled substance, she had stored the crack inside her vagina along with her tampon. Because she wanted to dispose of her contraband before reaching Commercial Avenue, she smoked some of the crack in a gangway and discarded the rest, as well as her pipe. She also testified that "[t]he stuff was garbage."

¶ 5        Shortly thereafter, T.K. saw defendant in an alley. He grabbed her and, while holding a knife close to her body, walked her to a garage and had her sit on the pavement. Defendant, with the knife on his lap, told T.K. to "suck his dick." He then grabbed her hair and forced her to put her mouth on his penis. In addition, he had her get on her knees and pull down her pants, causing her knees to become scratched on the rocky pavement. While trying to force his penis inside her, despite the presence of a tampon, he lost his erection. Defendant said, "Look what you did, bitch. Now you're going to have to suck it again." T.K. complied. After having T.K. return to her knees, defendant forced his penis inside her. He walked away when he was finished.

¶ 6        T.K. removed the tampon, spit on the ground and left the alley. She then got the attention of nearby police officers. As this was happening, she saw defendant and reported to the police what he had done. Other officers down the street stopped him and recovered his knife. T.K.

identified defendant and showed the crime scene to the police. Subsequently, she completed a sexual assault kit at the hospital and was interviewed at the police station. T.K. denied telling the police that she removed the tampon before intercourse.

¶ 7     Officer Thomas Curran testified that after T.K. got his attention and reported that defendant had just sexually assaulted her at knife point, other officers stopped defendant and recovered a knife from his person. Officer Curran had also observed cuts and bruises on her knees. Officer Curran further testified, however, that T.K. never stated that she had smoked crack prior to the incident or that she wore a tampon during the assault.

¶ 8     Nurse Lauvendar Moore testified that at the hospital, T.K. said she was walking through an alley when a man with a knife accosted her and forced her to have oral and vaginal intercourse. Dr. Elbert Smith similarly testified that T.K. reported that a man put a knife to her neck and forced her to have oral and vaginal sex. While Nurse Moore did not observe any signs of trauma to T.K.'s knees or vagina, Dr. Smith had observed bruises on her knees. He added that the pelvic exam revealed no cuts or tears and that T.K. was menstruating. The parties also stipulated that the DNA on the vaginal swabs taken at the hospital matched defendant's DNA profile.

¶ 9     The State also presented the testimony of J.T. as evidence of motive, identity, propensity and *modus operandi*. According to J.T., at about 2 a.m. on November 4, 2008, she was walking to a gas station when she saw defendant on the opposite side of the street. He subsequently appeared next to her and asked where she was going. When J.T. responded that she was going to get cigarettes, he said, "No, you're not. You're going with me." He put one arm around her shoulder and held a knife to her neck. After leading her down some steps under a porch, he said, "You're going to suck my dick."

¶ 10    Defendant placed his penis in J.T .'s mouth while holding the knife. J.T. complied but stopped when a car approached. He warned her not to speak. When the people in the car went inside a building, defendant said, "Now I'm going to fuck you. Turn around." J.T. attempted to stall, but defendant put the knife to her neck, so she lowered her pants. Defendant, still holding the knife, put his penis inside J.T.'s vagina. Eventually, he ejaculated on the steps and left. Afterward, J.T., approached a woman who had been standing nearby but the woman had no phone to lend J.T. Together, they followed defendant from a short distance. The two women then encountered a man who did have a phone. Ultimately, the police came to their location and apprehended defendant.

¶ 11    At the hospital, J.T. gave a false name because she was on drugs and thought the police would not believe her. She failed to go to the police station the next morning for the same reason. She also had a 2003 retail theft conviction.  In February 2010, detectives contacted J.T. At that time, she supplied her real name and identified defendant from a lineup. J.T. was subsequently convicted of prostitution in 2012.

¶ 12    Officer Alexander, who responded to J.T.'s sexual assault call, testified on behalf of the defense that his report did not state that J.T. said a car approached or that she followed defendant after the assault. Similarly, Detective Dantes testified that his report did not say that J.T. claimed that a car approached during the assault and he did not recall J.T. reporting that she followed defendant afterward. Both officers testified that no knife was recovered.

¶ 13    Defendant, who had a prior aggravated domestic battery conviction, testified that his encounters with T.K. and J.T. were consensual. On the night of September 7, 2009, he went for a walk after a spat with his wife. He carried a knife because the neighborhood was dangerous. As he approached 85th and Commercial, he saw an associate drive past. When defendant turned to

4

see what the associate was looking at, defendant saw T.K. He approached her and asked what she was doing. She said she was "fucked up." Defendant, who occasionally engaged with prostitutes, inquired whether T.K. wanted to earn money "sex-wise." She said yes. After groping each other to ensure that neither was a police officer, they entered an alley, stopped in front of a garage, and defendant gave her $20. He did not display his knife or force her to enter the alley.

¶ 14    Defendant and T.K. had oral sex followed by vaginal intercourse. She then performed oral sex again because he lost his erection. After defendant recovered his erection, they resumed vaginal intercourse, but he lost his erection once more. As a result, defendant asked for a refund. When T.K. responded that that was not her problem, defendant demanded his money back and displayed his knife to ensure that T.K. knew he was serious. She complied with his demand.

¶ 15    Shortly thereafter, officers approached defendant and asked whether he and his girlfriend had been in a fight. Defendant answered that he and his wife had argued but he did not believe she would have contacted the police for that. The police took his knife and told him he had been identified. At the police station, defendant said that his DNA would not be in T.K.'s vagina because he did not ejaculate. He also told the police that he received a refund from T.K. but did not state that he ordered T.K. to finish at knifepoint.

¶ 16    Defendant further testified that on a prior occasion, he was walking around and ingesting crack, while armed with a knife, when he encountered J.T. She agreed to "get high" and have sex. He understood this to mean sex in exchange for crack. In a stairwell off an alley, J.T. performed oral and vaginal sex. Defendant did not force her to. He was agitated, however, because she requested money afterward, which he had not planned on giving her. When defendant walked away, J.T. followed him. She also stopped to converse with a woman known to

be a drug addict, although defendant himself stopped to buy drugs from someone. When the police appeared, defendant panicked and ran because he was high.

¶ 17    Detective Sutherland testified that he spoke to both T.K. and defendant after their encounter. T.K. stated that she had made it to Commercial Avenue before encountering defendant. In addition, she did not report that she had smoked crack before reaching Commercial Avenue or that defendant had a knife. She did say, however, that he forced her to have oral sex. T.K. further reported that she had removed her tampon prior to vaginal intercourse. In contrast, defendant had denied having vaginal intercourse with T.K. but acknowledged that he gave T.K. $20 in exchange for oral sex. When she stopped abruptly, he pulled out his knife and ordered her to finish. Defendant did not state that he had demanded a refund.

¶ 18    In rebuttal, Detective Dantes testified that defendant said he and J.T. had consensual sex in exchange for crack but never said J.T. asked for money. Assistant State's Attorney (ASA) Holly Kremin also testified that defendant said he paid T.K. $20 for oral sex but when she stopped, he pulled out a knife and ordered her to finish. He never said he demanded his money back. ASA Kremin further testified that defendant denied having vaginal sex with T.K.

¶ 19    The jury found defendant guilty of  two counts of aggravated criminal sexual assault and the trial court subsequently imposed consecutive 21-year prison terms. We affirmed the judgment on direct appeal, rejecting his challenges to the jury instructions, trial counsel's alleged ineffectiveness and closing arguments. *People v. Williams*, 2014 IL App (1st) 123491-U.

¶ 20    On January 25, 2016, defendant filed a postconviction petition, asserting that trial counsel was ineffective for failing to call Arthur Graham to corroborate his defense. According to defendant, Graham would have corroborated defendant's assertion that he and T.K. met each other at 85th and Commercial Avenue and left there together. Specifically, Graham would have

testified that he had driven past T.K. standing on Commercial Ave. In addition, defendant asserted that trial counsel was ineffective for usurping his right to choose a bench trial. Defendant told counsel he wanted a bench trial "because he believed it best for himself if the State be held to the perimeters of the law and not afforded the opportunity to play on [the] jury[']s emotions, sympathy and/or prejudices." Contrary to defendant's wishes, however, trial counsel demanded a jury trial. Defendant further alleged that appellate counsel was ineffective for failing to raise those issues on direct appeal.

¶ 21 The trial court subsequently appointed counsel, who filed a supplemental petition supported by affidavits from defendant and Graham. According to defendant's affidavit, he was walking to clear his head after fighting with his wife when he ran into Graham. In contrast to defendant's *pro se* petition, defendant alleged in his affidavit that the two men walked down Commercial Street from 87th Street toward 84th Street, at which point they were approached by T.K. She offered to have sex in exchange for money, but they turned her down and walked away. Before trial, defendant told his attorney that Graham could corroborate his version of what happened, but counsel did not call Graham as a witness.

¶ 22 Graham's affidavit stated that he was sitting on his porch when he saw defendant walk by. Defendant was upset about the argument with his wife, and they decided to go for a walk. At 84th and Commercial, they were approached by a prostitute who offered to have sex with them. Defendant told her to go away. When she continued to talk to them, Graham also told her to go away, and she complied. The two men returned to Graham's house. When they parted ways, Graham watched defendant walk toward his own house. Graham stated that he had "reviewed photos of [T.K.] and I believe she is the woman that approached [defendant] and I." According

7

to Graham, he was willing and able to testify at defendant's trial, but trial counsel did not ask him to do so.

¶ 23    The supplemental petition argued that the credibility of defendant and T.K. was crucial because this was a case of "he said, she said." While Graham could not testify that the sexual encounter was consensual, Graham could corroborate defendant's assertion that T.K. had offered to have sex with him for money and contradict T.K.'s testimony that she was never on Commercial Avenue.

¶ 24    The supplemental petition also addressed defendant's claim that trial counsel usurped defendant's choice of a bench trial. Similar to his *pro se* petition, defendant's affidavit stated that before trial, he informed defense counsel that he "did not want a jury trial due to the sensitive nature of [his] case." He informed counsel on numerous occasions that he wanted a bench trial, but counsel ignored his requests and decided to proceed to a jury trial. At the time of his trial, defendant did not know that the choice was his.

¶ 25    The State filed a motion to dismiss, arguing, in pertinent part, that even if defendant and T.K. initially engaged in consensual sexual activity, defendant's own prior statement that he threatened her with a knife to continue oral sex rendered Graham's proposed testimony moot. The nonconsensual nature of the encounter was also corroborated by testimony that T.K.'s knees were injured and J.T.'s similar account of an encounter with defendant just 10 months earlier. The State further argued that it was unclear how Graham came to identify T.K. Finally, the State argued that defendant had not proven that he intended to have a bench trial.

¶ 26    On October 15, 2020, the trial court granted the State's motion to dismiss defendant's claim that trial counsel was ineffective for failing to present Graham's testimony. The court

advanced to a third-stage evidentiary hearing on defendant's claim that counsel usurped his choice of a bench trial.

¶ 27     At the evidentiary hearing, defendant testified that he and trial counsel, Armando Sandoval, had two conversations regarding whether to proceed to a bench or jury trial. Both conversations took place in the "bull pen" and lasted a couple of minutes. During their first conversation, defendant told Sandoval that he wanted a bench trial because he did not believe the State had sufficient evidence to convict him and would, instead, appeal to the jury's emotions. Sandoval responded that he was confident that the judge would find defendant guilty because he had been in the courtroom with the judge that very day. In reply, defendant said he believed that the jury would find him guilty, but the judge would not.

¶ 28     Later, on the day that Sandoval told defendant he was ready to demand trial, defendant again told Sandoval that he wanted a bench trial, explaining his reasoning once again. Sandoval reiterated that a jury would be better and that the trial judge would find defendant guilty. During their conversations, Sandoval did not tell defendant that the ultimate decision whether to have a jury or bench trial belonged to defendant. In addition, at that time, defendant thought that Sandoval made that decision and the trial court never asked defendant if he wanted a jury trial. Furthermore, defendant did not directly tell the trial judge that he wanted a bench trial because the judge "didn't let us speak in the courtroom. Whenever we tried to speak, he would tell us to talk to our attorneys." Sandoval had also told defendant that the trial judge did not permit defendants to speak in the courtroom. Moreover, defendant did not speak up because the matter was already decided. Defendant clarified that Sandoval did not merely advise him to choose a jury trial; rather, Sandoval made that decision for him.

¶ 29    Sandoval testified that at the time of defendant's trial, Sandoval had nine years of experience in the Cook County Public Defender's Office and was assigned to Judge Crane's courtroom. Sandoval recalled having two conversations with defendant regarding the difference between a bench trial and a jury trial, but it was an ongoing conversation every time they met.

¶ 30    Two or three months before trial, defendant, Sandoval and his partner, Rosa Silva, were in the Cook County jail when defendant asked what Sandoval thought about having a bench trial. Based on the evidence in the case, and proof of other crimes in particular, Sandoval told him "that my advice would be going to a jury trial." The trial court had already determined that other crimes evidence would be admitted at trial. According to Sandoval, defendant indicated that he understood Sandoval's reasoning and "agreed that we should do a jury trial."

¶ 31    On another occasion close to trial, Sandoval was sitting at the defense table when the sheriff informed him that defendant wanted to speak with him. In the lockup area, defendant asked whether Sandoval still thought that a jury trial was best. Although defendant thought he might be better off with a bench trial, Sandoval again advised him that his best chance of being acquitted was a jury trial because evidence involving another victim would be admitted. Defendant then agreed to a jury trial, but Sandoval did "remember him saying, are you sure about this?" Sandoval told him that while there were no guarantees, Sandoval believed that a jury trial was best. According to Sandoval, he never forced defendant to choose a jury trial and had indicated to defendant that it was his decision whether to have a bench or jury trial. In short, defendant's case proceeded to a jury trial because "after discussing it with me, that's what [defendant] wanted." Sandoval had believed that they were on the same page.

¶ 32    Sandoval acknowledged that at the time of defendant's trial, he was a Grade 2 assistant public defender and that his office encouraged attorneys to do jury trials for promotion.

Specifically, "they looked at how many jury trials you did, and to be honest, I think that was -- you know, that's just my opinion. I think that's all the committee looked at was -- that was the main thing, how many jury trials." Regardless of how his office promoted attorneys, however, he had advised defendant to choose a jury trial for his own sake. Sandoval testified that given the time required to prepare for defendant's trial, Sandoval probably would have been able to complete more jury trials had defendant chosen a bench trial.

¶ 33 In rebuttal, defendant testified that when Sandoval gave him reasons why a jury trial would be better, defendant did not say that he was okay with that. Instead, defendant said he thought it was best to choose a bench trial, but Sandoval did not agree.

¶ 34 The trial court denied defendant's petition, finding that while Sandoval's account was credible, defendant's account was not. Defendant himself had freely chosen a jury trial and now had "buyer's remorse." The court did not believe that the issue of promotion impacted Sandoval's advice either. Defendant now appeals.

¶ 35                                   II. Analysis

¶ 36 The Act is divided into three stages. *People v. Joiner*, 2023 IL App (1st) 211553, ¶ 40. Pertinent to this appeal, the defendant's petition and supporting documentation must make a substantial showing of a constitutional violation to avoid dismissal at the second stage. *People v. Pingleton*, 2022 IL 127680, ¶ 34. In determining whether the defendant has met this burden, all well-pleaded facts are taken as true unless rebutted by the original trial record. *People v. Domagala*, 2013 IL 113688, ¶ 35. No factfinding or credibility determinations are made at this stage. *Id*. In an appeal from a second-stage dismissal, the question is whether the petition's allegations, liberally construed in favor of the defendant and taken as true, are sufficient to invoke relief under the Act. *People v. Sanders*, 2016 IL 118123, ¶ 31. We review the second stage

dismissal of a postconviction petition *de novo*. *Id*. Thus, the reviewing court makes an independent assessment of the defendant's petition. *Id.*

¶ 37     If a petition survives to the third stage of proceedings, the defendant is entitled to an evidentiary hearing. *Pingleton*, 2022 IL 127680, ¶ 34. At this hearing, the defendant must prove by a preponderance of the evidence that a constitutional violation has ensued. *People v. Luciano*, 2023 IL App (2d) 220112, ¶ 49. Additionally, the trial court assesses the credibility of the witnesses, determines the weight to be accorded to their testimony and resolves any evidentiary conflicts. *Id*. Reviewing courts will affirm the court's factual findings and determinations unless they are against the manifest weight of the evidence. *People v. Phillips*, 2017 IL App (4th) 160557, ¶ 55. A court's findings are manifestly erroneous where they are arbitrary, unreasonable and not based on the evidence. *Id.*

¶ 38                              A. Failure to Present Graham's Testimony

¶ 39     We first address defendant's assertion that the trial court erroneously granted the State's motion to dismiss his claim that trial counsel was ineffective for failing to present the testimony of Graham to corroborate his defense.

¶ 40     To establish the ineffective assistance of counsel, the defendant must demonstrate that (1) counsel's performance was objectively deficient, and (2) this deficient performance prejudiced the defense. *Id. ¶* 57. A defendant can overcome the strong presumption that counsel's strategy was sound if that strategy appears to be so unreasonable and irrational that no reasonably effective defense attorney under like circumstances would pursue it. *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 85. That being said, counsel's decision whether to call a specific witness constitutes a strategic choice that is generally not subject to attack. *People v. King*, 316 Ill. App. 3d 901, 913 (2000). The failure to call a witness who would have contradicted the State's

evidence and support the defense may nonetheless indicate deficient performance. *People v. Bass*, 2022 IL App (1st) 210249, ¶ 30. This is particularly true where counsel fails to call a witness whose testimony would support an otherwise uncorroborated defense. *King*, 316 Ill. App. 3d at 913.

¶ 41    To show prejudice, the defendant must demonstrate a reasonable probability that absent counsel's deficient performance, the result of the proceedings would have been different. *Phillips*, 2017 IL App (4th) 160557, ¶ 57. A reasonable probability that the result would have been different absent counsel's errors is a probability sufficient to undermine confidence in the trial's outcome. *King*, 316 Ill. App. 3d at 913. Furthermore, the failure to satisfy either prong precludes a defendant's ineffective assistance of counsel claim. *Phillips*, 2017 IL App (4th) 160557, ¶ 57.

¶ 42    Taking the petition's allegations as true, we find defendant did not make a substantial showing that trial counsel was deficient for failing to call Graham to testify. Graham was listed as a potential witness in discovery, indicating that counsel was aware of Graham and the substance of his testimony. Neither defendant's affidavit, his petitions nor Graham's affidavit alleged that defense counsel failed to speak with Graham, just that counsel did not call him to testify. While defendant suggests for the first time in his reply brief that counsel may not have contacted Graham, we find that this point is forfeited. Ill. S. Ct. R. 341(h)(7) (Oct. 1, 2020). Furthermore, defendant cannot add allegations to his petitions on appeal and neither can we. The burden of making a substantial showing of a constitutional violation below belonged to defendant alone.

¶ 43    We similarly find that Graham's affidavit failed to specify what he told trial counsel, notwithstanding that the affidavit set forth what he now claims he would have testified to at trial.

Notably, the account given by Graham in his affidavit differs from the account set forth in defendant's *pro se* petition, which said nothing about Graham speaking with T.K. In addition, if Graham was the "associate" that defendant testified about seeing before encountering T.K., his trial testimony would constitute yet a third account, one that did not even include defendant and Graham walking together. In short, Graham did not allege that he told trial counsel that T.K. solicited defendant, and we cannot assume that Graham did. Standing alone, testimony that Graham saw defendant walking or even walked with him, would not be particularly helpful to the defense. While defendant correctly argues that factual disputes are to be resolved at the third stage, we are not presented with a factual dispute: we are presented with a significant factual omission. Absent any allegation about what Graham actually told counsel, defendant has not shown that counsel was deficient for failing to present his testimony. Moreover, even if the jury were to believe Graham's proposed testimony that T.K. solicited defendant for sex, such testimony would not be so exculpatory or compelling in this case that a reasonable probability exists that the jurors would have found the encounter was entirely consensual. *Cf. People v. Tate*, 305 Ill. App. 3d 607, 610, 612 (1999) (finding the defendant made a substantial showing that counsel was ineffective where identification was at issue, but counsel failed to present the testimony of three alibi witnesses and there was no apparent strategy for not presenting their testimony).

¶ 44    According to Graham, T.K. solicited him and defendant for sex when they were walking on Commercial Avenue, despite defendant's trial testimony suggesting that he was alone when he encountered T.K. Even assuming Graham's testimony corroborated the notion that defendant's encounter with T.K. began with her consent, it does not follow that their encounter remained consensual. Detective Sutherland and ASA Kremin testified that defendant said he

14

displayed a knife when T.K. stopped performing oral sex and he ordered her to finish. See also

*People v. Meyers*, 2016 IL App (1st) 142323, ¶ 29 (finding that "declining to call an alibi witness

whose testimony could be contradicted by the defendant's own postarrest statements as to his

whereabouts falls within the realm of reasonable trial strategy, even if the known alibi witness

had never been interviewed"). To be sure, defendant testified at trial that he brandished a knife

only after T.K. had performed sexual acts, as a means of obtaining a refund. Yet, Graham's

proposed testimony would not have corroborated defendant's testimony as to when he displayed

a knife because Graham was not present. Furthermore, Graham's testimony would not negate (1)

Officer Curran's testimony that T.K. was disheveled, frightened and frantic; (2) the testimony of

both Officer Curran and Dr. Smith that T.K.'s knees were injured; and (3) J.T.'s similar account

of an encounter with defendant 10 months earlier. While Graham would have undermined

T.K.'s testimony that she encountered defendant before reaching Commercial, the location of

their meeting standing alone was of relatively little significance to either the State's case or the

defense. Liberally construing the petition in defendant's favor, we find he has failed to make a

substantial showing that trial counsel was ineffective for failing to present Graham's testimony.

¶ 45                                    B. Bench Trial

¶ 46        Next, defendant asserts that the trial court erroneously denied his claim that trial

counsel usurped his right to choose a bench trial.

¶ 47        The constitutional right to a bench trial has existed since Illinois became a state.

*People v. Gersch*, 135 Ill. 2d 384, 392 (1990). In addition, the right to a jury trial encompasses

the right to waive one. *People v. Kiefel*, 2013 IL App (3d) 110402, ¶ 18 (citing *People ex rel.*

*Daley v. Joyce*, 126 Ill. 2d 209, 222 (1988)). Furthermore, the choice of whether to waive a jury

trial belongs to the defendant, not his counsel. *People v. Townsend*, 2020 Ill App (1st) 171024,

¶ 24. Where a defendant claims that trial counsel was ineffective for usurping his right to choose a bench trial, the defendant need not demonstrate that the result of his trial would have been different; rather, prejudice is established if a reasonable probability exists that the defendant would have waived a jury trial but for counsel's usurpation. *Id*.; *cf. People v. Simon*, 2014 IL App (1st) 130567, ¶ 74 (recognizing that advice on waiving a jury trial generally constitutes a matter of strategy that will not support an ineffective assistance of counsel claim).

¶ 48    At the evidentiary hearing, defendant testified that he told trial counsel that he wanted a bench trial but that counsel, contrary to defendant's wishes, proceeded to a jury trial. Defendant also testified that he did not understand that the decision was his to make. See *Kiefel*, 2013 IL App (3d) 110402, ¶ 18 (recognizing that the trial court is not required to admonish defendants of their right to a bench trial or obtain a written waiver thereof). In contrast, Sandoval testified that he indicated to defendant that it was his decision whether to have a bench or jury trial and that he did not force defendant to choose a jury trial. Sandoval testified that defendant's case proceeded to a jury trial because "after discussing it with me, that's what [defendant] wanted." While defendant disputed Sandoval's representation on rebuttal, the trial court found Sandoval to be more credible. Defendant has not demonstrated that the court's finding in this regard was against the manifest weight of the evidence.

¶ 49    Defendant argues that Sandoval's testimony was not credible because he acknowledged that he needed to do more jury trials to be promoted. Yet, Sandoval also testified that in the time he worked on defendant's jury trial, Sandoval could have conducted multiple jury trials in other cases. Sandoval also testified that he advised defendant to choose a jury trial for his own sake. Accordingly, the trial court was not required to find the promotion process rendered Sandoval's testimony incredible.

¶ 50    Defendant further argues that Sandoval's testimony that he merely gave defendant advice to choose a jury trial was not credible because that advice was contrary to case law and Sandoval's own statements at trial. Sandoval testified that he advised defendant to choose a jury trial because evidence of a crime involving a different victim would be admitted at trial. Defendant correctly observes that other crimes evidence is "considered dangerous because a jury might convict the defendant for being a pad person rather than for having actually committed the crime he is currently charged with. *People v. Stanbridge*, 348 Ill. App. 3d 351, 355 (2004). Conversely, the risk of undue prejudice accompanying the admission of other-crimes evidence is, in general, significantly diminished where the trier of fact is a judge rather than a jury. *People v. Felton*, 2019 IL App (3d) 150595, ¶ 47. Furthermore, in arguing against the admission of other crimes evidence, Sandoval argued that defendant could be prejudiced by the jury hearing such evidence. Yet, the trial court was entitled to find that Sandoval nonetheless testified credibly that he merely advised defendant to choose a jury trial because Sandoval genuinely believed that a jury trial was best, regardless of whether Sandoval was correct.

¶ 51    Defendant testified that during their pretrial discussions, Sandoval said he was confident that the trial judge would find defendant guilty because he had been in the courtroom with the judge that very day. Having been assigned to that judge's courtroom, Sandoval may have formed opinions regarding the trial judge's inclinations in this case. By the time jury selection began, Sandoval would have been well aware of the court's findings in granting the State's motion to present other crimes evidence. The court had found there was substantial probative value and "fairly extreme" prejudice with respect to the other crimes evidence, noting similarities in the time that the crimes occurred, the method involved, the short temporal distance between the offenses and the physical distance between the locations. The court also noted that the same type

17

of act occurred and involved the same DNA. Knowing that the court found the other crimes evidence to be compelling, counsel may have genuinely believed it better for defendant to take his chances with the jury. Moreover, trial counsel's belief that other crimes evidence would be prejudicial in a bench trial did not foreclose counsel from concluding, and arguing, that such evidence would be prejudicial in a jury trial as well.

¶ 52    The special concurrence faults defendant and his counsel for failing to bring "the original transcript of the interaction between defendant, counsel and trial court about choosing a bench or jury trial to the attention of this court by filing it in the record as a supplement." This presumes, however, that such a conversation occurred and that a resulting transcript exists. The trial court is not required to admonish a defendant of his right to a bench trial or obtain a written waiver of that right. *Kiefel*, 2013 IL App (3d) 110402, ¶ 18. In addition, the decision whether to admonish a defendant of his right to a bench trial constitutes a matter within the trial court's discretion. *People v. Brown*, 2013 IL App (2d) 110327, ¶ 23. This court has noted potential problems resulting from this type of admonishment. *Id.* ¶ 22 (observing that a trial court's admonishment of "a defendant regarding his right to a bench trial might well influence the defendant's decision regarding whether to exercise his or her right to a jury trial"). Absent any suggestion to the contrary, we decline to presume that the trial court admonished or questioned defendant regarding his right to a bench trial or that our record is incomplete.

¶ 53    Finding no basis to set aside the trial court's factual determination that defendant, rather than Sandoval, chose to proceed to a jury trial, we agree with the court's finding that trial counsel was not ineffective.

¶ 54                                   III. Conclusion

¶ 55    Taking defendant's allegations as true and liberally construing them in his favor, defendant has not demonstrated that trial counsel was ineffective for failing to present Graham's testimony. In addition, the trial court's finding that defendant himself chose a bench trial was not against the manifest weight of the evidence. Accordingly, defendant has not shown that further proceedings are warranted with respect to either ineffective assistance of counsel claim.

¶ 56    For the foregoing reasons, we affirm the trial court's judgment.

¶ 57    Affirmed.

¶ 58    JUSTICE PUCINSKI, specially concurring:

¶ 59    I concur but only because no one, not the defendant, not his post-trial attorney, or his appellate counsel brought the original transcript of the interaction between defendant, counsel and trial court about choosing a bench or jury trial to the attention of this court by filing it in the record as a supplement.

¶ 60    This gap leaves us with no information about what actually happened when the trial court discussed the selection of bench or jury trial in court.

¶ 61    For example, if the trial court did not tell Mr. Williams that the choice was his alone, that would have been a problem for me.

¶ 62    However, if the trial court did, in fact, question Mr. Williams about the choice of a jury trial based on his attorney's representation to that effect, and Mr. Williams did not speak up, that would have been, under the practice at the time, sufficient to defeat Mr. Williams's claim that it was his attorney who chose the jury, not Mr. Williams himself.

¶ 63    I have already commented, in my dissent in *People v. Devois Turner*, 2023 Ill App (1st) 191513, that the simple questions that judges ask defendants about their foundational choices do

not really get to the heart of the matter: whether the trial attorney pressured the defendant one way or another, or if the defendant truly understood that it is his choice alone.

¶ 64 The *Turner* case centered on the defendant's choice to testify or not. However, each of the principles below applies equally to the defendant's choice of a jury or bench trial. My message is the same in either case.

¶ 65 "In order to truly discover what is going on with this foundational right of the defendant, courts need to develop more layered questions about the decision not to testify. The American Bar Association Criminal Justice Section recently released the 2023 Report of its Plea Bargain Task Force.[1] While the report focused on the mechanics of plea bargains, many of its recommendations are instructive for determining if a defendant's decision not to testify is his or hers alone and is truly voluntary.

¶ 66 Each of the Principles discussed below apply equally well to plea bargains and the decision to testify or not.

1) Principle 2 criticizes the use of "impermissibly coercive incentives or incentives that overhear the will of the defendant." The court needs to know if the defendant's attorney has "impermissibly coerced the defendant." So, while the court asks the defendant if he has been threatened, that question could be broken down into several parts, for example: do you know that you and only you can decide if you will testify? That means that while your attorney can give you advice, you don't have to listen to it. Did your attorney give you advice on testifying? Did he explain his reasons to you? Do you want to ignore that advice? Did your attorney or anyone else threaten to leave your case if you testified? Did you feel threatened by any specific language

---

[1] The Report may be accessed here: Thea Johnson, *2023 Plea Bargain Task Force Report*, (Am. Bar Ass'n 2023), https://www.americanbar.org/content/dam/aba/publications/criminaljustice/plea-bargain-tf-report.pdf.

your attorney or anyone else used in your discussions? Did you feel that it is hopeless to testify because then your attorney would drop out of the case? Did your attorney or anyone else tell you that if you testify he will not be responsible for the result? Did your attorney or anyone else tell you that you will not be able to appeal if you testify? Did your attorney or anyone else tell you that if you testify you will almost certainly be found guilty?

2) Principle 7 states, among other things, that the defendant [should] understand the consequences of his decision. For example, the court could ask of the defendant: Sir, what do you think will happen if you decide to testify?

3) Principle 9 states that "defendants should receive all available discovery, including exculpatory materials, prior to the entry of a guilty plea and should have sufficient time to review such discovery before being required to accept or reject a plea offer." The same sense of fairness should govern the defendant's decision to testify. Does the defendant know what the State knows? Is he likely to face some surprise if he testifies? Does he know how any surprise might affect the outcome of the trial? Did he have enough time to go over the discovery material? Did his attorney go over the material with him? Does he believe there is something missing from the discovery? What? Does he have any questions of the court about any of the discovery?

4) Principle 11 discusses collateral consequences of a guilty plea. There are likely collateral consequences of testifying. The court could ask, for example, what do you think is the best that can happen if you testify? What do you think is the worst that can happen? What do you think the jury (or I, the judge) will think if you do not testify? Do you know that no one can ever hold it against you in any way if you decide not to testify? Did your attorney or anyone else tell you that if you testify you will be in prison longer?

21

¶ 67 Underlying all of the ABA Task Force recommendations is the goal of asking fewer yes/no questions, putting all questions in simple language, and making sure that the defendant has no follow up questions of his own." See *People v. Devois Turner*, 2023 Ill App (1st) 191503 (Pucinski, J., dissenting).